Argued and submitted October 26, 2005, reversed and remanded with instructions to reinstate judgment against OHSU in the amount of $200,000 and to reinstate claims against the individual defendants July 5, petition for review allowed October 3, 2006 (341 Or 449)

Jordaan Michael CLARKE,
a minor,
by his guardian ad litem,
Sari Clarke,
*Appellant,*

*v.*

OREGON HEALTH SCIENCES UNIVERSITY,
a public corporation;
Mustafa Adnan Cobanoglu, M.D.;
John David Blizzard, M.D.; Sanjeev K. Sharma, M.D.;
Steven A. Fiamengo, M.D.; Betsy E. Soifer, M.D.;
Jennifer Stewart, R.R.T.; and Ana Wilson, R.N.,
*Respondents,*

*and*

Veerappa K. M. REDDY, M.D.,
*Defendant.*

0005-05116; A124560

138 P3d 900

Kathryn H. Clarke argued the cause for appellant. With her on the briefs were William A. Gaylord, Linda K. Eyerman, Todd A. Bradley, and Gaylord Eyerman Bradley, PC.

William F. Gary argued the cause for respondents. With him on the brief were Sharon A. Rudnick, C. Robert Steringer, Karla Alderman, and Harrang Long Gary Rudnick P.C.

Before Edmonds, Presiding Judge, and Linder and Wollheim,* Judges.

EDMONDS, P. J.

---

* Wollheim, J., *vice* Richardson, S. J.

## EDMONDS, P. J.

This case presents the issue whether the Oregon legislature can constitutionally limit the amount of damages that a person injured by medical malpractice at defendant Oregon Health and Sciences University (OHSU) can receive from OHSU and the individuals who treated him there. Plaintiff, through his guardian ad litem, appeals after the trial court substituted OHSU as the sole defendant and entered judgment on the pleadings under ORCP 21 B against OHSU in the amount of $200,000, the limit under the Oregon Tort Claims Act (OTCA), ORS 30.260 to 30.300. We affirm in part and reverse in part and remand on plaintiff's claims against the individuals who treated him.

## I. BACKGROUND

Plaintiff was born at OHSU in February 1998 with a congenital heart defect. The heart defect was diagnosed prior to his birth, and plaintiff was readmitted to OHSU in May 1998 for surgical repair of the defect. Surgery was performed, and the heart defect was successfully repaired. Plaintiff was then placed in a surgical intensive care unit at OHSU. While in the surgical intensive care unit, plaintiff suffered prolonged oxygen deprivation causing permanent and profound brain damage. According to plaintiff, the brain damage was the direct result of negligence on the part of OHSU and the individuals treating plaintiff in failing to recognize problems with the endotracheal tube that was supplying plaintiff with oxygen, in failing to remedy those problems in a reasonable time, in failing to provide an appropriately trained pediatric specialist to diagnose the cause of oxygen starvation and correct the problem, and in placing plaintiff in a surgical intensive care unit rather than a pediatric or other intensive care setting with staff who could have recognized and responded to the oxygen deprivation.

Plaintiff further alleged that, as a result of negligence on the part of OHSU and the individuals treating him, he is "totally and permanently disabled, essentially unaware of his surroundings, permanently unable to communicate with other persons, probably cortically blind, quadriplegic, epileptic, spastic, uneducable, and totally permanently

dependent on care-givers for all aspects of daily activities and life care * * *." He sought damages for permanent total life and health care in the amount of $11,073,506, damages for lost earning capacity in the amount of $1,200,000, and noneconomic damages in the amount of $5,000,000.

Initially, plaintiff brought claims against OHSU and against the individuals who treated him (the "individual defendants").[1] OHSU then moved to substitute itself as the sole defendant in place of the individual defendants, pursuant to ORS 30.265(1).[2] Plaintiff opposed the substitution, arguing that the elimination of a remedy against individual public employees and agents would violate the Oregon Constitution. The trial court granted the motion to substitute, and plaintiff filed a second amended complaint naming only OHSU as a defendant. In its answer to the second amended complaint, OHSU admitted that it was negligent in one or more of the particulars alleged by plaintiff and that such negligence resulted in permanent injury to him. OHSU further admitted that "plaintiff sustained economic and noneconomic damages in excess of the monetary limitations of the Oregon Tort Claims Act as a result of the injuries caused by the negligence of OHSU."

At the same time that it filed its answer, OHSU moved for judgment on the pleadings pursuant to ORCP 21 B.[3] OHSU argued that, because it had admitted its negligence, as well as its maximum liability under the OTCA, all matters in controversy could be resolved on the pleadings. Plaintiff opposed the motion and petitioned the court to reconsider its ruling regarding the substitution of OHSU for the individual defendants, arguing that a judgment limiting plaintiff's recovery under the OTCA to a claim against OHSU would violate his constitutional rights. The trial court rejected plaintiff's arguments, granted OHSU's motion, and entered judgment in favor of plaintiff and against OHSU in

---

[1] One of the individual defendants below, Dr. Reddy, was not served with a notice of appeal and is not a party to this appeal.

[2] ORS 30.265(1) provides, in part, that, "[i]f an action or suit is filed against an officer, employee or agent of a public body, on appropriate motion the public body shall be substituted as the only defendant."

[3] ORCP 21 B provides, "After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings."

the amount of $200,000, the maximum award under the limits of the OTCA. Plaintiff appeals that judgment.

On appeal, plaintiff argues that, by entering judgment against OHSU in the amount of $200,000, the trial court denied him the right to a remedy under Article I, section 10, of the Oregon Constitution, and the right to a jury trial under Article I, section 17.[4] He makes separate arguments as to the application of the OTCA to his claim against OHSU and his claim against the individuals who treated him. We begin with plaintiff's arguments regarding the application of the OTCA to his claim against OHSU.

## II.  PLAINTIFF'S CLAIM AGAINST OHSU

Plaintiff raises two separate constitutional challenges to the application of the OTCA damages limitation, ORS 30.270, to his claim against OHSU. First, he argues that the entry of judgment on the pleadings under the OTCA—which capped his damages at $200,000—deprived him of a remedy against OHSU in violation of Article I, section 10. Second, he argues that the entry of judgment pursuant to the OTCA damages limitation deprived him of the right to a jury trial on his claim against OHSU in violation of Article I, section 17. We begin by addressing plaintiff's Article I, section 10, argument because, as will become apparent, the resolution of that issue determines the scope of plaintiff's right to a jury trial against OHSU.

A.  *Article I, section 10*

Plaintiff argues that, at common law, he would have had an uncapped claim for damages against OHSU. By imposing a cap on his damages, he contends, the OTCA violates his constitutional right to a remedy by due process of law under Article I, section 10. OHSU responds that it would have been immune at common law and, therefore, the application of the damages cap to plaintiff's claims against OHSU

---

[4] In the trial court, plaintiff advanced an argument under Article I, section 20, of the Oregon Constitution. In a footnote in his opening brief on appeal, plaintiff states that the "argument merges with the contention that the application of [the] OTCA deprives plaintiff of a complete remedy for an injury, and plaintiff therefore will not separately address Article I, section 20." Because plaintiff does not offer any independent argument under Article I, section 20, we do not discuss it further.

does not implicate Article I, section 10. Because we agree with OHSU that, at common law, it would have been immune from liability for the negligent acts that injured plaintiff, we reject plaintiff's argument under Article I, section 10.

■ The "remedy clause" of Article I, section 10, as it is commonly known, provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." In *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 124, 23 P3d 333 (2001), the Supreme Court explained the purpose of that clause:

> "The drafters of the Oregon remedy clause identified absolute rights respecting person, property, and reputation as meriting constitutional protection under the remedy clause. As to those rights, the remedy clause provides, in mandatory terms, that remedy by due course of law shall be available to every person in the event of injury."

As a result of the remedy clause, "[t]he legislature lacks authority to deny a remedy for injury to absolute rights that existed when the Oregon Constitution was adopted in 1857." *Id.* at 119. However, the remedy clause does not "freeze in place common-law causes of action that existed when the drafters wrote the Oregon Constitution in 1857." *Id.* at 124. That is, "[t]he legislature may abolish a common-law cause of action, *so long as it provides a substitute remedial process in the event of injury to the absolute rights that the remedy clause protects.*" *Id.* (emphasis added).

This case differs from *Smothers* in one key respect: here, no statute denies plaintiff a common-law cause of action; indeed, ORS 30.265 and ORS 30.270 provide him with a substituted remedy for the injuries he suffered at OHSU, albeit a limited one. However, as noted in *Smothers*, the court "has suggested that, in addition to being a means for seeking redress for injury, the word 'remedy' also refers to the amount of damages that a person is entitled to recover for an injury." 332 Or at 120 n 19.

Accordingly, in analyzing plaintiff's challenge under Article I, section 10, we apply the two-step approach outlined by the Supreme Court. First, we determine whether the injury that plaintiff has alleged is one for which the remedy

clause guarantees a remedy. If we answer that question affirmatively, and if the legislature has abolished that common-law remedy, then the second step of the analysis is to determine whether the legislature has provided a constitutionally adequate substitute remedy. *Jensen v. Whitlow*, 334 Or 412, 418, 51 P3d 599 (2002).

The first step of our inquiry requires us to determine whether, at the time that the Oregon Constitution was enacted, the common law of Oregon would have recognized a claim for damages against OHSU under the circumstances of this case. The parties, appropriately, focus their arguments on whether OHSU would have been immune at common law. Plaintiff contends that OHSU is a "non-state public corporation" and that, at common law, such corporations did not enjoy the full immunity of the sovereign. Rather, those types of corporations were immune from suit only when engaged in so-called "governmental" functions; when performing "proprietary" acts, they were liable just like a private corporation. OHSU, in response, argues that it is a state-created entity, performing state functions, and would thereby have enjoyed full immunity at common law.

### 1. *Governmental immunity at common law*

The principle of sovereign immunity originated in the English rule that the king could not be sued in his own courts. *Hale v. City of Portland*, 308 Or 508, 513, 783 P2d 506 (1989) (citing, among other authorities, Sir Frederick Pollock and Frederic William Maitland, I *History of English Law* 518 (2d ed 1898)). "Although arguably not justified in a democracy, the sovereign immunity of the American states was universally accepted." *Hale*, 308 Or at 513 (footnote omitted). The doctrine was adopted in the Oregon Territory and was not modified; thus, "sovereign immunity was a part of this state's law at the time of statehood." *Id.* at 514.

When they adopted Article IV, section 24, of the Oregon Constitution—at the same time that they adopted Article I, section 10—its drafters ensured that "[p]rovision may be made by general law, for bringing suit against the State, as to all liabilities originating after, or existing at the time of the adoption of this Constitution[.]" Thus, "[o]ur Constitution is framed on the premise that the state is immune

from suit and that if immunity is lifted it shall be done so by the action of the legislature." *Vendrell v. School District No. 26C et al*, 226 Or 263, 278, 360 P2d 282 (1961).

In that historical context, it is clear that a plaintiff's remedies against a public body created by the state to perform functions on behalf of the state would have been understood by the drafters to have been entirely dependent on the will of the legislature. That is, in 1857, a plaintiff would not have had any *absolute* rights against such a body; rather, the legislature would have had the ability, when creating a public body to operate as an instrumentality of the state, to determine the scope of the public body's liability. *See Hale*, 308 Or at 518 (at the time of statehood, instrumentalities of the state government, performing state government functions, partook "fully of the state's immunity from suit") (citing *Vendrell*, 226 Or 263 (recognizing application of sovereign immunity to school districts), and *Templeton v. Linn County*, 22 Or 313, 29 P 795 (1892) (recognizing the immunity of counties unless an action is authorized by the legislature)).

*Hale* illustrates this principle. In *Hale*, the court addressed an Article I, section 10, challenge to the damages cap of the OTCA in an action against the Port of Portland and the City of Portland. The court first examined whether the port would have been liable at common law. The port, the court noted, was established by Oregon Laws 1891, chapter 791, as "a separate district, to be known as The Port of Portland[.]" *Hale*, 308 Or at 517. The port was to have control of the Willamette and Columbia Rivers at Portland, East Portland, and Albina, and between those cities and the sea. *Id.* While its functions have been "expanded to reflect the changed commercial focus of the Pacific Northwest due to the passage of nearly a century, the Port continues to promote, *inter alia*, the maritime and shipping interests of the greater Portland area." *Id.* at 518. After so describing the port, the court stated that, "[u]nlike cities, but like other port districts, *see generally*, ORS ch 777, the Port is an instrumentality of the state government, performing state functions." *Id.* Because, as noted above, "[o]ther state instrumentalities, including some in the form of municipal corporations, partake fully of the state's immunity from suit," the court concluded that the port would have been immune at common

law. *Id.* "It follow[ed] that, contrary to the contention of [the plaintiff in *Hale*], ORS 30.270(1)(b) does not deny plaintiff any right he has against the Port by virtue of the guarantee in Oregon Constitution Article I, section 10, because there never was such a right." *Id.*[5]

OHSU, like the Port of Portland, is a state-created public corporation, performing governmental functions on behalf of the state. OHSU was established in 1995 as an "independent public corporation":[6]

"Oregon Health and Science University is established as a public corporation and shall exercise and carry out all powers, rights and privileges that are expressly conferred upon it, are implied by law or are incident to such powers. The university shall be a governmental entity performing governmental functions and exercising governmental powers. The university shall be an independent public corporation with statewide purposes and missions and without territorial boundaries. The university shall be a governmental entity but shall not be considered a unit of local or municipal government or a state agency for purposes of state statutes or constitutional provisions."

ORS 353.030.[7]

In establishing OHSU as a public corporation, the legislature specifically identified the public policy of OHSU in carrying out its mission:

"(1)   It shall be the public policy of the Oregon Health and Science University in carrying out its mission as a public corporation:

---

[5] However, the court in *Hale* reached a different conclusion as to the City of Portland. The city, the court concluded, would have been immune for "governmental" activities but would have been liable for "proprietary" activities. 308 Or at 518. The maintenance of roads and streets—the source of the negligence claim in *Hale*—had, at common law, been "somewhat arbitrarily classified as this second, 'proprietary' type of activity." *Id.* at 518-19. The city, therefore, would have been exposed at common law to liability under the circumstances of that case. *Id.* at 519.

[6] Before 1995, OHSU was a division of the Oregon State System of Higher Education.

[7] Unless otherwise noted, our citations to statutes within ORS chapter 353 are to the current versions of the statutes. Although the statutes have been amended since 1995, those amendments are not material to our analysis.

"(a)   To serve the people of the State of Oregon by providing education in health, science, engineering and their management for students of the state and region;

"(b)   To provide:

"(A)   An environment that stimulates the spirit of inquiry, initiative and cooperation between and among students, faculty and staff;

"(B)   Research in health care, engineering, biomedical sciences and general sciences; and

"(C)   The delivery of health care to contribute to the development and dissemination of new knowledge."

ORS 353.030. The legislature also enumerated "the following public purposes and missions on behalf of the State of Oregon" for OHSU:

"(a)   Provide high quality educational programs appropriate for a health and science university;

"(b)   Conduct research in health care, engineering, biomedical sciences and general sciences;

"(c)   Engage in the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state;

"(d)   Provide outreach programs in education, research and health care;

"(e)   Serve as a local, regional and statewide resource for health care providers; and

"(f)   Continue a commitment to provide health care to the underserved patient population of Oregon."

ORS 353.030(3). Those "public purposes and missions" are to be carried out by OHSU in the manner that "best promotes the public welfare of the people of the State of Oregon." ORS 353.030(4).[8]

---

[8] Although OHSU was separated as a university from the Oregon State System of Higher Education, the legislature considered the newly established OHSU to be a "continuation of the former university with respect to its duties, functions and powers, and not a new authority, for the purpose of succession to all rights and obligations of the former university * * *." Or Laws 1995, ch 162, § 38.

■     Despite the above expressions of legislative intent, plaintiff argues that OHSU would not have been immune at common law because the legislature "intended to make OHSU as independent as possible of the state and its processes." According to plaintiff, "[u]ntil 1995, OHSU was a state agency and the state's sovereign immunity applied to it. However, the language of ORS 353.020 now makes clear that OHSU is not a state agency[.]" (Underscoring in original.) Thus, plaintiff contends, OHSU is now separate from the state and therefore would not have enjoyed immunity at common law.

Initially, we disagree with plaintiff's premise that, simply because the legislature intended for OHSU to be independent of the state for certain purposes, it should no longer be considered a state instrumentality performing state functions. As discussed above, governmental immunity at common law extended to "instrumentalities of the state government." *Hale*, 308 Or at 518. We agree with plaintiff's characterization of OHSU in one respect: the 1995 legislation made OHSU more independent of state government than it was before. That independence was intended to give OHSU more operational flexibility to better carry out its statewide mission. In fact, the independence created by the legislature essentially was from the statutes and constitutional provisions concerning state *agencies*, such as state personnel rules, state contracting procedures, and state centralized services. Testimony, Senate Committee on Education, SB 2, Feb 28, 1995, Ex C, p 1 (written explanation of Janet Billups, OHSU Legal Policy Advisor) ("Its autonomy will be similar to the Port of Portland, Tri-Met and other public bodies that are independent of state administrative provisions."); *id.* at p 2 (explaining that the independent nature of the university must be clearly defined to avoid the result in *Frohnmayer v. SAIF*, 294 Or 570, 660 P2d 1061 (1983), in which the court held that SAIF, though labeled an "independent public corporation," was simply an agency with certain delegated powers).

Nonetheless, OHSU continued to perform its core functions as a provider of educational and health care services "on behalf of the State of Oregon" after 1995. ORS 353.030. Although an "independent public corporation,"

OHSU's purposes and missions identify matters of statewide concern, and it clearly performs the statewide functions of education, research, and delivery of healthcare. And, though not a state "agency" for purposes of statutes and constitutional provisions, OHSU certainly is a part of the state government. *See* ORS 353.020; *see also* ORS 353.350 (OHSU revenue bonds "shall be considered to be bonds or obligations of *a political subdivision of the State of Oregon* for the purposes of all laws of the state" (emphasis added)). For those reasons, we conclude that, like the Port of Portland, OHSU continues to be an instrumentality of the state, created by the state to perform state functions, and would have been immune in 1857 from suit to the extent provided by the legislature and the common law.[9] *See Hale*, 308 Or at 518. Because plaintiff would not have had an absolute right to a common-law action against OHSU in 1857 in light of the immunity provided to state instrumentalities at that time, we do not reach the second step of the analysis under Article I, section 10. Accordingly, we reject plaintiff's argument that the damages cap of the OTCA deprives him of a remedy against OHSU in violation of Article I, section 10, of the Oregon Constitution.[10]

## B. *Article I, section 17*

Alternatively, plaintiff argues that the damages cap of the OTCA violates his constitutional right to a jury trial against OHSU under Article I, section 17, of the Oregon Constitution, because it infringes on the jury's ability to award damages. In *Lakin v. Senco Products, Inc.*, 329 Or 62, 82, 987 P2d 463 (1999), the Supreme Court held that Article I, section 17, only "guarantees a jury trial in civil actions for which

---

[9] In his reply brief, plaintiff relies on *Takle v. University of Wisconsin Hospital and Clinics Authority*, 402 F3d 768 (7th Cir 2005), in which the court held that an institution similar to OHSU was not an "arm of the state" for purposes of sovereign immunity under the Eleventh Amendment to the United States Constitution. As plaintiff concedes, the test for whether a state governmental entity can be sued in federal court under the Eleventh Amendment, though using related terminology, involves a different inquiry from one concerning governmental immunity from suit at common law. We do not find that decision persuasive as to the issues in this case.

[10] In effect, the OTCA constitutes a partial waiver of the governmental immunity enjoyed by the state and its instrumentalities in 1857. *Hale*, 308 Or at 517. OHSU, however, still retains that immunity for claims in excess of the OTCA damages cap.

the common law provided a jury trial when the Oregon Constitution was adopted in 1857[.]" We already have determined that, in 1857, plaintiff would not have had a claim against OHSU, let alone a right to a jury trial. Accordingly, Article I, section 17, does not prohibit the legislature from interfering with the full effect of a jury's assessment of damages in these circumstances. *See Lawson v. Hoke*, 339 Or 253, 267, 119 P3d 210 (2005) (where plaintiff's Article I, section 10, argument failed for lack of an absolute common-law remedy, plaintiff's Article I, section 17, argument necessarily failed as well). For that reason, we reject plaintiff's argument that the OTCA damages cap violates his right to a jury trial against OHSU.

## III. PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

We turn now to plaintiff's assignment of error regarding the substitution of OHSU for the individual defendants pursuant to ORS 30.265(1).[11] As noted above, plaintiff makes two separate constitutional challenges under this assignment of error. Initially, plaintiff argues that the substitution of OHSU for the individual defendants deprives him of a remedy in violation of Article I, section 10. Second, he argues that the substitution of a capped remedy against OHSU in place of his claims against the individual defendants deprives him of the right to trial by jury in violation of Article I, section 17. We address both arguments in turn.

A. *Article I, section 10*

■ With respect to the substitution of OHSU as the sole defendant in this case, plaintiff's argument under Article I, section 10, is relatively straightforward: At common law in 1857, a plaintiff in Oregon would have had a cause of action

---

[11] ORS 30.265(1) provides, in part, that the

"sole cause of action for any tort of officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 shall be an action against the public body only. The remedy provided by ORS 30.260 to 30.300 is exclusive of any other action or suit against any such officer, employee or agent of a public body whose act or omission within the scope of the officer's, employee's or agent's employment or duties gives rise to the action or suit. No other form of civil action or suit shall be permitted."

for medical malpractice against public employees. The remedy clause of Article I, section 10, of the Oregon Constitution does not permit the legislature to abolish that common-law remedy unless it provides an adequate substitute remedy. Because a limited recovery from OHSU is not an adequate substitute remedy, the application of ORS 30.265(1) in this case violates Article I, section 10.

Defendants agree that plaintiff would have had a claim at common law against the individual defendants. Defendants state in their brief that, "At common law, plaintiff would have had a claim against the individual defendants in this case—health care professionals working at OHSU." We agree and accept that concession. *See Smothers*, 332 Or at 129 ("It is undisputed that, at the time of the American Revolution, the common law recognized a cause of action for negligence."); *cf. Antin v. Union High School Dist. No. 2*, 130 Or 461, 478, 280 P 664 (1929) ("[I]f the duty is one which the officer owes both to the public and to a private individual, and the private individual is injuriously affected specially, and not as a member of the public, then for such violation the injured party may sue [the officer] for the wrong done."); *Mattson v. City of Astoria*, 39 Or 577, 579, 65 P 1066 (1901) (citing authority for the proposition that it is settled law that public officers are liable to an individual who sustains special damage as a result of negligence in the ministerial performance of delegated public duties).

Defendants also agree that, under ORS 30.265(1), plaintiff's common-law remedy against the individual defendants has been abolished by the legislature and that a claim against OHSU has been substituted in its place. The parties disagree, however, on whether the substitution of a capped remedy against OHSU is a constitutionally adequate substitute remedy. The Supreme Court provided the framework for our inquiry in this case in *Jensen*, a case that involved an Article I, section 10, challenge to the same version of ORS 30.265(1) at issue here. In *Jensen*, the plaintiff filed a complaint in United States District Court on behalf of her minor daughter, Gurkin. She alleged that Gurkin had been abused by a male foster parent while she was in the custody of what was then Children Services Division of the State of Oregon (CSD). She brought claims against the individual agents and

employees of CSD, and the defendants moved to dismiss the claims against them and to substitute the state as the sole defendant in the action, pursuant to ORS 30.265(1). The district court certified the following questions to the Oregon Supreme Court:

"(1) Does the limitation of causes of action for a tort committed by an agent of a public body to a cause of action against only the public body violate Article I, section 10, of the Oregon Constitution?

"(2) Does the limitation of causes of action for a tort committed by an agent of a public body to a cause of action against the public body violate Article I, section 17, of the Oregon Constitution?

"(3) Does the limitation of causes of action for a tort committed by an agent of a public body to a cause of action against only the public body violate Article I, section 20, of the Oregon Constitution?"

334 Or at 415.

As to the question involving Article I, section 10, the Supreme Court framed the relevant inquiry as follows: "[T]he question in this case is whether, on its face, the damages cap renders the substitute remedy provided in ORS 30.265(1) an 'emasculated' remedy in violation of Article I, section 10." *Id.* at 420. The court answered that question in the negative, holding that the OTCA is not *facially* unconstitutional because it is at least capable of constitutional application; in fact, the "cap" is not even implicated in every case. *Id.* at 421.

This case picks up where *Jensen* left off. It comes to us after judgment on the pleadings under ORCP 21 B. Plaintiff alleges that the cost of his health care for the rest of his life will amount to $11,073,506, apart from claims for non-economic damages and for damages for lost earning capacity. In turn, OHSU concedes that plaintiff's damages will exceed $200,000. Significantly, no trial has occurred yet in this case, and plaintiff's actual damages have not been determined. Thus, for purposes of the issues before us, we accept as true the factual allegations in plaintiff's complaint. *Curtis v. MRI Imaging Services II*, 327 Or 9, 16, 956 P2d 960 (1998). The question before us, then, is slightly different than that in *Jensen*. We must determine whether, *as applied in this case*

*to plaintiff's complaint*, "the damages cap renders the substitute remedy provided in ORS 30.265(1) an 'emasculated' remedy in violation of Article I, section 10." 334 Or at 420.

In *Smothers*, the court used the term "emasculated" to describe a remedy that is "incapable of restoring the right that has been injured." *Smothers*, 332 Or at 119-20. As the court noted in *Smothers*, the word "remedy" refers not only to the remedial process for seeking redress, but *to what is required to restore a right that has been injured.*" *Id.* at 124 (emphasis added). Based on that understanding of the remedy clause, and as applied in this case at the pleading stage, we are unable to conclude that the OTCA would provide a constitutionally adequate substitute remedy under Article I, section 10, in the event that plaintiff were able to prove an entitlement to his damages as alleged. Taking plaintiff's allegations as true, his economic damages alone exceed $12 million. Recovery of $200,000 from only OHSU would provide plaintiff with less than two percent of his economic damages. By any reasonable measure, recovery of less than two percent of one's economic damages—particularly given the nature of the injuries alleged—is a remedy "incapable of restoring the right that has been injured." 332 Or at 119-20.[12] In our view, the drafters of Article I, section 10, would have considered that kind of recovery to constitute an "emasculated remedy" for the right that has been injured.

Significantly, defendants do not argue that a remedy of $200,000 is capable of restoring the right that has been injured in this case. Rather, they argue that a substitute remedy need only be "substantial," and that the "substantiality of a substitute remedy is determined categorically, not on a case-by-case or as-applied basis." Specifically, defendants rely on *Hale* for the proposition that the OTCA "strikes a new balance" between individuals injured by employees of public bodies and those who formerly would have been liable and argue that, under *Hale*, that new balance is constitutionally permissible. For the reasons that follow, we disagree with

---

[12] *Cf. Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995) (rejecting Article I, section 10, challenge to the damages cap in *former* ORS 18.560, *renumbered as* ORS 31.710 (2003), on the ground that the capped amount of $500,000 in noneconomic damages, plus an *uncapped* award of $100,000 in economic damages, was a constitutionally adequate substitute remedy).

defendants' reasoning and their assertion that the result in *Hale* controls the outcome in this case.

*Hale* involved a challenge to the damages cap in the OTCA, albeit under an earlier version of the OTCA. The plaintiff in *Hale* was injured when the vehicle in which he was riding collided with an obstacle in the road, and his medical bills alone were alleged to exceed $600,000. He brought claims against several defendants, including the City of Portland and the Port of Portland, for negligently maintaining the road. The city and the port, both "public bodies" under ORS 30.270(1)(b), confessed judgment, each in the amount of $100,000, the statutory cap.

On appeal, the plaintiff in *Hale* argued that, by limiting his damages against the city and the port, the OTCA deprived him of his remedy in violation of Article I, section 10. As we discussed in greater detail above, 206 Or App at 618-19, the Supreme Court held that the port, had it existed in 1857, would have enjoyed full immunity at common law and, therefore, Article I, section 10, was not implicated as to the port. *Hale,* 308 Or at 518. Yet the city, the court concluded, would not have enjoyed that same immunity. *Id.* Rather, at common law, a city would have been immune only when engaged in "governmental" functions. *Id.* (citing *Noonan v. City of Portland,* 161 Or 213, 221, 88 P2d 808 (1939)). Thus, the court proceeded to determine whether the limitation on damages in the OTCA denied the plaintiff an adequate remedy when applied to his claims against the city.

Ultimately, the *Hale* court upheld the OTCA limitation on damages on the record before it. The court first summarized its earlier Article I, section 10, jurisprudence, focusing particularly on two cases, *Noonan* and *Evanhoff v. State Industrial Acc. Com.,* 78 Or 503, 154 P 106 (1915):

> "[Those two cases] held only that Article I, section 10, is not violated when the legislature alters (or even abolishes) a cause of action, so long as the party injured is not left entirely without a remedy. *Under those cases, the remedy need not be precisely of the same type or extent; it is enough that the remedy is a substantial one.*"

*Hale,* 308 Or at 523 (emphasis added). Next, the court described the effect of the OTCA:

"The statute specifically identifies the new balance it strikes between municipal corporations and those to whom certain of those corporations could, under limited circumstances, formerly have been liable:

" 'Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of *its* officers, employees and agents acting within the scope of their employment or duties, *whether arising out of a governmental or proprietary function * * *.' "

308 Or at 514-15 (emphasis in *Hale*). The court determined that, although a limit had been placed on the size of an award under the OTCA by the legislature, "[t]he class of plaintiffs has been widened by the legislature by removing the requirement that the injured party show that the municipal corporation's activity that led to the injury was a proprietary one." *Id.* at 523. The fact that the OTCA conferred a benefit and imposed a "counterbalancing burden" was significant in the court's view:

"This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one. This may not be what plaintiff wants. It may not even be what this court, if it were in the business of making substantive law on this subject, would choose to enact. *But it is within the legislature's authority to enact in spite of the limitations of Oregon Constitution, Article I, section 10.*"

*Id.* at 523 (emphasis added).

Initially, defendants argue that "[t]his case poses the same issue as that addressed in *Hale*, which controls here." We disagree with that premise. As the Supreme Court later held in *Jensen*, the *Hale* court did not address the issue whether the OTCA is constitutional under Article I, section 10, as applied to the individuals whose negligence resulted in damages to the plaintiff:

"In other words, the OTCA, at [the time that *Hale* was decided[13]], allowed a plaintiff to pursue a cause of action against an individual employee-defendant. By contrast,

---

[13] *See* ORS 30.265 (1989), *amended by* Or Laws 1991, ch 861, § 1.

since 1991, the OTCA has limited a plaintiff's cause of action to one against the employing public body only. For that reason, the issue presented here differs from that presented in *Hale* and *does not resolve the question whether ORS 30.265(1), on its face, provides a constitutionally adequate substitute remedy for the claim plaintiffs once had against individual employees of a public body."*

*Jensen*, 334 Or at 420 (emphasis added).

Indeed, the concurring opinion by Justice Linde in *Hale* specifically pointed out that

"the court has allowed legislative immunization of cities from tort liability only on condition that the individuals who are personally responsible for harm qualifying as a legal injury remain liable. *Batdorff v. Oregon City*, 53 Or 402, 100 P 937 (1909); *Mattson v. Astoria*, 39 Or 577, 65 P 1066 (1901). This is analogous to altering or limiting the scope of *respondeat superior* rather than wholly depriving a plaintiff of a remedy in due course of law for harm that no one has declared not to be a legal injury when caused by public rather than private negligence. *Because this case presents no claim against individual public 'officers or employees, or agents,' ORS 30.265, I concur with the court.*"

308 Or at 530 (Linde, J., concurring) (emphasis added). Thus, *Hale* did not involve a claim against individual tortfeasors who then sought protection under the OTCA, and there was no occasion in that case for the court to consider the issue here—*i.e.*, the constitutionality of the substitution of a capped claim against a public body where a plaintiff is barred from proceeding against individual tortfeasors.

■     Next, defendants argue that, even if the issue before us was not addressed in *Hale*, the reasoning in *Hale* requires this court to analyze the substantiality of a substitute remedy on a categorical rather than on an "as-applied" basis to an

---

[14] The state made a similar argument in *Jensen* to the effect that "in determining whether a substitute remedial process is substantial and therefore constitutionally adequate, the court must analyze the remedy categorically, by examining whether potential plaintiffs as a group, not as individuals, retain a substantial remedy." The court declined to reach that issue "[b]ecause of the manner in which [it] resolve[d] plaintiff's Article I, section 10, challenge * * *." 334 Or at 419 n 5.

individual plaintiff.[14] We reject that argument for three related reasons. First, we observe that defendant's argument appears inconsistent with the plain language of Article I, section 10, which guarantees a remedy to "every man * * * done *him* in *his* person, property, or reputation." (Emphasis added.) Article I, section 10, refers to remedies guaranteed to individuals, not remedies guaranteed to classes or groups of individuals. Second, the *Smothers* court specifically held—consistently with the plain language of Article I, section 10—that a proper inquiry as to the constitutionality of a legislatively substituted remedy involves a "case-by-case analysis." *Smothers*, 332 Or at 135 (concluding that "determining whether the exclusive remedy provisions of ORS 656.018 (1995) violate [the remedy clause of Article I, section 10,] *involves a case-by-case analysis*" (emphasis added)).

And finally, *Hale* did not hold that the legislature's decision to provide counterbalancing benefits and burdens to a particular category of plaintiffs in a statutory scheme is the sole criterion by which the constitutional adequacy of a substitute remedy is determined. Rather, that was the method the court used under the circumstances of that case to determine whether the remedy provided by the OTCA was an adequate substitute for claims against a public body.[15] Moreover, the intrinsic nature of an as-applied challenge under Article I, section 10, requires an assessment of a particular plaintiff's circumstances. *Smothers*, 332 Or at 135. Whatever methodology is selected to evaluate those circumstances must lead to a result that comports with the fundamental requirement for substitute remedies as stated in *Smothers*: that the remedy be capable of restoring the right that has been injured. 332

---

[15] We note that one of the principles underlying the court's analysis in *Hale* of the legislature's prerogative to provide counterbalancing benefits and burdens appears to have been that

"the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative objective * * *. Article I, [section] 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common[.]"

308 Or at 521 (quoting *Noonan*, 161 Or at 248-50). That principle was expressly disavowed in *Smothers*. 332 Or at 118-19. Thus, to the extent that *Hale*'s emphasis on the legislature's ability to counterbalance the remedial scheme had, as a predicate, the notion that the legislature could even *abolish* common-law rights, that predicate was repudiated by *Smothers*.

Or at 124. In light of *Smothers,* we do not believe that the *Hale* court created a test under Article I, section 10, that would permit the legislature, through a balancing of benefits and burdens, to constitutionally substitute, for some plaintiffs, a remedy that is incapable of restoring the right that has been injured.[16]

At the most basic level of analysis, a recovery of two percent of out-of-pocket loss or economic damages is simply not a "substantial" substitute remedy as required by Article I, section 10. Indeed, in that respect, *Hale* and *Smothers* are reconcilable. In *Hale,* the court opined that a substitute remedy "need not be precisely of the same type or extent; it is enough that the remedy is a substantial one." 308 Or at 523. In *Smothers,* the court stated that a substitute remedy cannot be an "emasculated" remedy that is "incapable of restoring the right that has been injured." *Smothers,* 332 Or at 119-20. Those formulations, in our view, describe opposite sides of the same concept. If, as the Supreme Court held in *Smothers,* the drafters of the Oregon Constitution intended to guarantee a remedy for injury to absolute rights, it is inconceivable that the drafters simultaneously would have granted the legislature the power to substitute a remedy that is "substantial" and yet wholly incapable of restoring the right that has been injured. For all of the above reasons, we reject defendants' arguments concerning the import of *Hale.*

Defendants also rely on two other Supreme Court cases, *Caviness v. City of Vale,* 86 Or 554, 565, 169 P 95

---

[16] Moreover, even if we were to conclude that the adequacy of a substitute remedy must be determined in every case by the class of plaintiffs, our result would be the same. In *Hale,* the court held that the OTCA, as applied to a city, was constitutional because it provided a remedy to parties who, prior to the OTCA, would not have had one. 308 Or at 523 (the legislature "widened" the class of plaintiffs who could sue a municipal corporation by removing the requirement that the municipal corporation's activity be a "proprietary" one). As applied to individual tortfeasors, the OTCA strikes no such similar balance. At common law, a plaintiff would have had a common-law cause of action against the individual tortfeasor regardless of whether the action was proprietary or governmental. *See Mattson,* 39 Or at 579. Thus, as applied to claims against individual tortfeasors, the only benefit provided by the OTCA's exclusive, capped remedy is, as defendants describe it, a judgment that is "virtually guaranteed to be paid" because it is backed "by the full faith and credit of the state." Categorically speaking, we do not believe that the "certainty" of an emasculated recovery for some plaintiffs, in exchange for their uncapped common-law claims, satisfies the requirements of Article I, section 10, as to those plaintiffs.

(1917), and *Evanhoff*, 78 Or at 523-24. They argue that, under those cases, the legislature constitutionally may substitute a limited remedy against a public body for a common-law claim against the individual agents and employees of that body. Defendants rely on a statement in *Caviness* that, "while not always perfect and complete, [the remedy] will be found sufficient in many cases." 86 Or at 565. But when that statement is read in context, it provides little help to defendants. In *Caviness*, the court held that the legislature may absolve a city of liability for the repair of defective streets or sidewalks, but that, in order to do so, "an *equivalent* remedy must be provided." *Id.* (emphasis in original). It further held that the absolution of a city from liability for injuries arising from defective streets or sidewalks is permissible under Article I, section 10, because the legislative authority *"has not attempted to take away the remedy that always existed against the officers of the city for failure to cause repair of defects coming to their knowledge,* which latter remedy, while not always perfect and complete, will be found sufficient in many cases." 86 Or at 565 (emphasis added). In other words, *Caviness* emphasizes the importance of the availability of a common-law remedy against a negligent employee or agent of a public body—the very remedy that the OTCA makes unavailable in this case. What *Caviness* does not do is comment on whether the legislature can, by providing a benefit to some, leave others with an emasculated remedy.[17]

Defendants' reliance on *Evanhoff* is similarly unavailing. In *Evanhoff*, the Supreme Court rejected a challenge to the newly enacted workers' compensation scheme. The court observed:

> "Before its enactment one workman out of three received a large compensation for his injuries by an action at law, while the remaining two were defeated and got nothing. Now every workman accepting its provisions receives some

---

[17] In fact, the court in *Caviness* noted that it had previously

"intimated a doubt as to the constitutionality of a charter provision which took away from a citizen a perfectly plain and efficacious remedy, and left in its place a partial and unsubstantial one; and this conviction has grown stronger in the mind of the writer from further consideration of the subject and examination of the authorities * * *."

*Id.* at 563-64 (referring to *Colby v. City of Portland*, 85 Or 359, 166 P 537 (1917)).

compensation if injured; and, taken as a whole, it will be found that more money in the way of compensation is received by the whole body of injured workmen than by the inadequate remedies afforded in the courts."

78 Or at 523. At the time that *Evanhoff* was decided, Oregon's workers' compensation scheme was voluntary, not compulsory. Every worker accepting its provisions received some compensation when injured on the job; but a worker was free to decline to participate under the act and to proceed to court with "every constitutional remedy intact." *Id.* at 518-19. Plaintiff is in a different position than injured workers under that scheme because he is unable to elect his common-law remedy against the individual tortfeasors. Thus, it cannot be said that his remedies at common law, recognized by Article I, section 10, are left "intact" by the legislature's enactments.

In summary, we conclude that, as applied to plaintiff's claims against individual tortfeasors at this stage of the proceedings and based on his allegations of injuries and damages, the provision of the OTCA that makes a remedy against OHSU "the sole cause of action for any tort of officers, employees or agents of a public body" violates Article I, section 10. It may be that, after plaintiff's damages are actually determined at trial, the constitutionality of the OTCA's exclusive remedy provision under Article I, section 10, will not be implicated. However, based on the record before us, if plaintiff is limited to a $200,000 recovery against OHSU and has no remedy against the individual defendants, and if plaintiff has suffered the damages he alleges, then he has been denied a substantial substitute remedy in violation of Article I, section 10. Accordingly, the trial court erred by entering judgment on the pleadings disposing of plaintiff's claims against the individual defendants.

B. *Article I, section 17*

Plaintiff also argues that the substitution of a capped remedy against OHSU violates his constitutional right to a jury trial against the individual defendants. According to plaintiff, "[a]s applied to the negligent physicians in this case, the [substitution of OHSU] simply becomes a mechanism for applying a damages cap, limiting the issues

that a jury can determine." Thus, plaintiff argues, the application of the OTCA as to the individual defendants violates the mandate of Article I, section 17, of the Oregon Constitution that, "[i]n all civil cases the right of Trial by Jury shall remain inviolate." Because we reverse and remand as to the substitution of the individual defendants under Article I, section 10, we need not reach this issue.[18]

## IV. CONCLUSION

For all of the reasons stated above, the trial court correctly determined that OHSU's liability is limited by the damages cap of the OTCA. However, given the damages alleged, judgment on the pleadings disposing of plaintiff's claims against the individual defendants was error.

Reversed and remanded with instructions to reinstate judgment against OHSU in the amount of $200,000 and to reinstate claims against the individual defendants.

---

[18] We express no opinion as to whether Article I, section 17, would be violated by application of the OTCA damages cap to the claims against the individual defendants—an issue that does not present itself given the procedural posture of this case and the substitution of OHSU as the lone defendant. We observe, however, that plaintiff's Article I, section 17, right to a jury trial may be intertwined with his right to a remedy under Article I, section 10. *See Jensen*, 334 Or at 422 (Article I, section 17, "is not a source of law that creates or retains a substantive claim or a theory of recovery in favor of any party"; instead, "[t]he right to pursue a 'civil action,' if it exists, must arise from some source other than Article I, section 17, because, that provision 'is not an independent guarantee of the existence of a cognizable claim' " (quoting *Sealey v. Hicks*, 309 Or 387, 396, 788 P2d 435 (1990), *overruled in part on other grounds by Smothers*, 332 Or at 123)). In the event that the issue whether the OTCA cap applies to the individual defendants arises on remand, the trial court should consider the implications of both Article I, section 10, and Article I, section 17, as they apply to plaintiff's claims.