Argued and submitted December 31, 2020; affirmed May 18; petition for review allowed, decision of Court of Appeals vacated, and case remanded to Court of Appeals for reconsideration in light of *Lowell v. Medford School Dist. 549C*, 370 Or 79, 515 P3d 359, September 16, 2022 (370 Or 214)

Linda Sue HOFER,
*Plaintiff-Appellant,*

*v.*

OREGON HEALTH AND SCIENCE UNIVERSITY,
*Defendant-Respondent.*

Multnomah County Circuit Court
18CV14839; A172328

511 P3d 414

Plaintiff sued Oregon Health and Science University (OHSU) for damages that she alleges she sustained after two of its physicians typed false statements into her medical record. Plaintiff sought recovery under two legal theories: defamation and medical negligence. The trial court concluded, on OHSU's motions for summary judgment, that OHSU was entitled to prevail (1) on plaintiff's defamation claims because those claims were barred by absolute privilege and (2) on her medical negligence claim because there were "insufficient facts to prove a basis" for that claim. On appeal, plaintiff assigns error to the trial court's granting of OHSU's summary judgment motions. As to the defamation claim, plaintiff argues that an issue of material fact exists as to whether her physicians were acting within the scope of their duties when they entered the notes at issue into plaintiff's medical records. As to the negligence claim, plaintiff argues that, as a patient, she has a "legally protected interest in the accuracy of her medical records," and, therefore, the trial court erred when it granted OHSU's summary judgment motion on that claim. *Held*: The evidence was insufficient to raise a genuine issue of fact regarding whether the physicians were carrying out their official duties. Therefore, OHSU was entitled to prevail on its absolute privilege defense. Additionally, plaintiff failed to develop or support her argument that she had a legally protected interest in the accuracy of her medical records that was sufficient to provide an exception to the physical injury rule that applies in negligence cases. Plaintiff also failed to introduce evidence establishing that her physicians had a specific duty to maintain accurate patient records for the specific purpose of protecting patients from emotional harm.

Affirmed.

Christopher A. Ramras, Judge.

David Wallace argued the cause for appellant. Also on the brief was Wallace Law Firm.

Janet M. Schroer argued the cause for respondent. Also on the brief were Holly E. Pettit and Hart Wagner LLP.

Before Mooney, Presiding Judge, and Pagán, Judge, and DeVore, Senior Judge.*

MOONEY, P. J.

Affirmed.

_____

\* Pagán, J., *vice* DeHoog, J. pro tempore.

## MOONEY, P. J.

Plaintiff sued Oregon Health and Science University (OHSU) for damages that she alleges she sustained after two of its employed physicians typed false statements into her medical record, which is maintained by OHSU in its electronic health records (Epic EHR) database. The statements in question include that plaintiff "obtained duplicate prescriptions, breached a medication contract and lied about methadone prescriptions." Plaintiff sought recovery under two legal theories: defamation and medical negligence.[1] The trial court concluded, on OHSU's motions for summary judgment, that OHSU was entitled to prevail (1) on plaintiff's defamation claims because those claims were barred by absolute privilege and (2) on her medical negligence claim because there were "insufficient facts to prove a basis" for that claim. Plaintiff appeals from the general judgment dismissing her claims, assigning error to the trial court's granting of OHSU's summary judgment motions. For the reasons that follow, we conclude that absolute privilege bars plaintiff's defamation claim and that the trial court did not err in dismissing plaintiff's negligence claim because no issue of material fact exists with respect to that claim and OHSU is entitled to prevail. We, therefore, affirm.

### FACTUAL BACKGROUND

In reviewing the trial court's summary judgment ruling, we view the record in the light most favorable to the nonmoving party—here, plaintiff—resolving all reasonable inferences in her favor. *Jennewein v. MCIMetro Access Transmission Services*, 308 Or App 396, 400, 481 P3d 939 (2021). The relevant facts are not in dispute, and we state them in accordance with the standard of review.

Plaintiff has a movement disorder known as restless leg syndrome (RLS). When she lived in the State of Washington, her physician treated her RLS with methadone.

---

[1] Plaintiff's first claim for relief against OHSU alleges defamation and defamation *per se* based upon statements made by Dr. MacDonald. Plaintiff's second claim for relief against OHSU alleges defamation and defamation *per se* based upon statements made by Dr. Bernard. Plaintiff's third claim for relief against OHSU alleges medical negligence based upon the acts and omissions of MacDonald and Bernard.

After moving from Washington to Oregon, plaintiff sought to establish care with an Oregon physician who would be willing to continue that same course of treatment. To that end, plaintiff saw Dr. MacDonald, a physician in the third year of her residency training program at OHSU's neurology clinic. MacDonald provided plaintiff with a prescription for a one-month supply, followed by a prescription for a three-month supply, of methadone to allow her time to establish a permanent relationship with a physician who would assume care of her RLS. Plaintiff subsequently met with a different physician, who agreed to continue the methadone treatment if plaintiff would provide a urine sample and sign a medication contract. Plaintiff was unable to give a urine sample and she left the appointment. She did not return to that clinic.

Plaintiff returned to defendant's neurology clinic on May 24, 2017, approximately nine months after her first visit there, and again saw MacDonald. MacDonald declined to prescribe additional methadone for plaintiff at that time and documented the medical encounter in plaintiff's medical record as follows:

"I have not seen [plaintiff] since her August 2016 initial visit, at which time I gave her a three month prescription for methadone. I gave her another 3 month prescription in December, at which time I told her it was possible that I would not be able to continue filling the prescription given the limitations to my clinic schedule, but that I would continue to explore options. I have not heard from her since that time until she appeared in my clinic today.

"In December, she established care with a new PCP in the family medicine clinic at Gabriel Park, who was willing to take on prescription of her methadone. She was seen on 3/10, at which time she signed a medication contract and was asked to take a urine test. She did not complete the urine test and refused to return to take the test on another day (per my discussion with her PCP, became irate and left the clinic suddenly), and therefore her care was terminated with that physician.

"In my clinic today, she appeared highly anxious. She did not make eye contact with me and answered pleasantries and preliminary history questions with one word answers.

I probed a bit as to why she was in my clinic now after having been lost to follow up for several months. She stated that she was here for methadone prescription. I asked if she had seen any other doctors for prescriptions, and she said no. I asked specifically about the family medicine clinic, where it seemed she had a willing provider, and she initially said that her PCP there had left and therefore couldn't prescribe the methadone, which was why she didn't obtain the prescription there. I felt that if not an outright lie (indeed, her PCP would be leaving at the end of the year), this was certainly a misleading response. When I told her that I had spoken to that doctor, she eventually stated that her PCP asked her to provide a urine sample, and she was unable to because she had just used the bathroom. She felt it was undue hardship to come back because the drive was too far. She specifically stated that the reason she did this was because she already had an appointment with me. However, mychart documentation does not corroborate this, and in fact, her appointment with me was not scheduled until 4/12.

"Her behavior is very concerning to me - despite telling me that no one has been willing to prescribe for her, she did in fact have a willing prescriber for methadone, the barrier to which was her unwillingness to complete a urine test. Although by history and chart review she does seem to have a reasonable indication for methadone, I am unwilling to continue to prescribe this for her at this time in light of her behavior. Her behavior both outside my clinic as well as in my office today demonstrates numerous red flags (which she did not exhibit at our initial visit), and I think she requires a prescriber with more experience with medication contracts. I offered her several other nonnarcotic medication options which are approved for treatment of RLS, which she declined. She left very shortly thereafter in the middle of our conversation."

MacDonald's attending physician, Dr. Bernard, reviewed the May 24, 2017, encounter as part of her supervisory role in MacDonald's residency training program and she, in turn, documented the following in plaintiff's medical chart:

"I personally interviewed the patient, performed the pertinent parts of the physical examination and personally formulated the plan with the resident [(MacDonald)]. I agree with the resident[']s documentation and have documented

any additions or exceptions. The patient has broken trust with another clinic at OHSU regarding methadone maintenance, and obtained duplicate prescriptions, and then left our clinic precipitously. She will not be rescheduled due to severance of trust and contract with providers."

Bernard later corrected that note by removing the language that said that she had "personally" evaluated plaintiff and "performed" parts of the exam because, in fact, she had not done so. She also acknowledged in deposition testimony that it was incorrect to have stated that plaintiff had obtained "duplicate prescriptions."

Plaintiff ultimately moved back to Washington in order to obtain care and treatment of her movement disorder from her previous Washington physician.

PROCEDURAL BACKGROUND

Plaintiff filed this lawsuit in April of 2018. A round of ORCP 21 A pleading motions was filed and litigated, including one that sought dismissal of the medical negligence claim on the grounds that plaintiff had not stated facts sufficient to constitute such a claim. The court granted OHSU's ORCP 21 A motion, noting its view that

"[f]rankly, in this case, at least thus far, I don't think the complaint is sufficient to allege that there was a standard of care that included a duty to protect against psychic harm. And I don't think the claim alleges any clear cut psychological harm that was suffered by the Plaintiff."

The court gave plaintiff leave to amend her complaint, which she did. OHSU filed an answer generally denying wrongdoing and raising several affirmative defenses including, among others, failure to state facts sufficient to constitute a negligence claim and, with respect to the defamation claims, absolute privilege.

OHSU filed its first motion for summary judgment raising notice issues under the Oregon Tort Claims Act[2] and seeking dismissal of the medical negligence claim for lack of sufficient facts to support that claim. The trial court granted summary judgment in favor of OHSU and against

---

[2] Notice under the Oregon Tort Claims Act is not before us.

plaintiff on the negligence claim "because there are insufficient facts to prove a basis for Plaintiff's claims." OHSU filed another motion for summary judgment arguing that (1) the allegedly defamatory statements entered into plaintiff's medical record are subject to absolute privilege and (2) plaintiff could not "establish the requisite elements of a claim for defamation." The court granted that motion on the basis of absolute privilege. Final judgment was entered, and this appeal followed.

## THE DEFAMATION CLAIMS

Plaintiff claims that statements contained within MacDonald's and Bernard's post-visit notes are false and defamatory, and that those notes were "entered and published" into her medical record, which is maintained by OHSU in its Epic EHR database, where those notes are available to be seen by healthcare providers who query that system in relationship to providing care and treatment for plaintiff. OHSU asserts that it is a part of state government, that MacDonald and Bernard are its employees and therefore government officials, that they wrote the post-visit notes within the course and scope of their duties as government officials for the purpose of documenting the delivery of healthcare services to plaintiff and that, as such, OHSU is protected from liability for the statements contained in those notes by the doctrine of absolute privilege.[3]

A party against whom a claim is asserted "may * * * move * * * for a summary judgment in that party's favor as to all or any part of any claim or defense." ORCP 47 B. In the face of such a motion, the nonmoving party has "the burden of producing evidence on any issue raised in the motion as to which [she] would have the burden of persuasion at trial." ORCP 47 C; *Two Two v. Fujitec America, Inc.*, 355 Or 319, 324, 325 P3d 707 (2014). Because absolute privilege is an affirmative defense on which OHSU would have the burden of persuasion at trial, OHSU has the burden on summary judgment to establish facts showing that the privilege

---

[3] Oregon recognizes the defenses of qualified privilege and absolute privilege in defamation claims. *DeLong v. Yu Enterprises, Inc.*, 334 Or 166, 170, 47 P3d 8 (2002). OHSU, however, does not claim that qualified privilege applies and we, therefore, address only the question of the applicability of absolute privilege.

applies, and that OHSU is entitled to prevail as a matter of law. ORCP 47 C; *Mouktabis v. A. M.*, 315 Or App 22, 25, 500 P3d 32 (2021).

Absolute privilege generally applies in governmental settings to statements made by public officials in the course of their public duties. *Lowell v. Medford School Dist. 549C*, 313 Or App 599, 604-05, 497 P3d 797, *rev allowed*, 368 Or 702 (2021). The defense of absolute privilege acts as a complete bar to liability for defamation. *Johnson v. Brown*, 193 Or App 375, 380, 91 P3d 741 (2004). The privilege is intended to ensure "the unhampered operation of the government," *Wallulis v. Dymowski*, 323 Or 337, 349, 918 P2d 755 (1996), and to promote the public welfare, *Grubb v. Johnson et al*, 205 Or 624, 631-32, 289 P2d 1067 (1955). Absolute privilege is based on the premise that it is more important to encourage public officials to speak freely in the discharge of their official duties than it is to allow individuals to sue public officials for defamatory statements that public officials may make in that context. As Judge Learned Hand put it:

> "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. ***"

*Gregoire v. Biddle*, 177 F2d 579, 581 (2d Cir 1949), *cert den*, 339 US 949 (1950).

The trend of Oregon's judicial decisions over the past 100 years has been to apply absolute privilege in an

increasingly broad fashion. Our state legislators have always enjoyed absolute privilege for statements made in the course of their legislative duties, and we have extended that privilege to official members of lesser legislative bodies. For example, in extending absolute privilege to a member of a port commission, the Oregon Supreme Court explained that "Oregon prides itself on its citizen participation." *Noble v. Ternyik*, 273 Or 39, 43, 539 P2d 658 (1975). "Uncompensated citizens, serving at least in part to fulfill their civic responsibility, comprise the vast bulk of numerous legislative bodies in Oregon," and public bodies do not meet privately, but rather in the open as required by the Oregon public meetings law. *Id.* at 43-44. Without absolute privilege, there would likely be fewer citizens willing to participate. *Id.* at 44.

Absolute privilege applies to statements made by judges, jurors, attorneys, and witnesses so that they may "speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for the recovery of damages." *Moore v. Sater et al*, 215 Or 417, 420, 335 P2d 843 (1959). The application of absolute privilege to statements made by attorneys in pleadings or in open court in the course of litigation was extended beyond pleadings and open court to other statements made by attorneys that are "pertinent" to litigation or "a judicial proceeding." *Chard v. Galton*, 277 Or 109, 112, 559 P2d 1280 (1977). And it has been applied to statements made to administrative bodies in the absence of an actual judicial or quasi-judicial proceeding. *Ramstead v. Morgan*, 219 Or 383, 394, 347 P2d 594 (1959).

Absolute privilege has been applied to statements made by "inferior as well as high-ranking" executive branch officers in the course of their official duties. *Shearer v. Lambert*, 274 Or 449, 454, 547 P2d 98 (1976). That privilege has been specifically applied to statements made by police officers in the course of their official duties. *See, e.g.*, *Chamberlain v. City of Portland*, 184 Or App 487, 491, 56 P3d 497 (2002) (applying absolute privilege to memorandum by police sergeant documenting conduct of police officer at conference); *Sandrock v. City of Corvallis*, 58 Or App 312, 315,

648 P2d 382, *rev den*, 293 Or 634 (1982) (applying absolute privilege to statements in which a police captain communicated defamatory material to detectives in the course of his official duties). And in *Christianson v. State of Oregon*, 239 Or App 451, 459, 244 P3d 904 (2010), *rev den*, 350 Or 297 (2011), we applied absolute privilege to statements made by a Department of Human Services (DHS) supervisor about a former employee who was applying for a new job with DHS. Most recently, we have applied absolute privilege to claims against a public school district arising out of a statement made by a district employee, a theater technician, to his supervisor, that he had observed the plaintiff, who had been providing piano tuning services to the district, to be intoxicated on school premises in violation of district policy. *Lowell*, 313 Or App at 604-05.

We now turn to the question of whether the trial court erred in concluding that, on the record before it, absolute privilege applies to statements made by MacDonald and Bernard in their post-visit chart notes concerning plaintiff. The legislature established OHSU as a public corporation, to act as a governmental entity, with the mission of carrying out the statewide functions of "education, research, and delivery of healthcare." *Clarke v. OHSU*, 206 Or App 610, 621-22, 138 P3d 900 (2006), *aff'd*, 343 Or 581, 175 P3d 418 (2007). OHSU "[e]ngage[s] in the provision of inpatient and outpatient clinical care and health care delivery systems throughout the state[.]" ORS 353.030(3)(c). OHSU presented evidence that MacDonald and Bernard, as OHSU-employed physicians, deliver healthcare to patients and also function as part of OHSU's educational mission through the residency program. It presented Bernard's declaration as evidence that residents, like MacDonald, who see patients at OHSU's neurology clinic "are responsible for taking a medical history, performing a physical exam, and summarizing the visit and the medical care provided to the patient in the patient's electronic medical record." It also presented evidence that an attending physician, such as Bernard, is "responsible for supervising the resident's exam of the patient, reviewing the patient's medical history and chart notes, including chart notes completed by the residents, and preparing [the attending physician's] own documentation in

the patient's electronic medical record reflecting [his or her] involvement and assessment related to the patient's care."

Plaintiff relies on *Clifford v. City of Clatskanie*, 204 Or App 566, 131 P3d 783, *rev den*, 341 Or 216 (2006), to argue that triable issues remain as to whether MacDonald and Bernard were authorized to include statements in plaintiff's medical record that amounted to false reports of "prescription fraud and the crime of obtaining duplicate prescriptions." Plaintiff, thus, argues that an issue of material fact exists as to whether the physicians were acting within the scope of their official duties when they entered those notes into plaintiff's medical record. In *Clifford*, as here, the defendant bore the burden to produce some evidence that the officer's statements—the disclosure of a 9-1-1 caller's identity—were made "during the performance of his official duties." *Id.* at 580. Because he did not produce such evidence, a material issue of fact remained as to the applicability of the defendant's absolute privilege defense. *Id.* In contrast, OHSU presented evidence in the form of a declaration from Bernard that described, in part, the roles of resident physicians and attending physicians working in OHSU's neurology residency training program, specifically including (1) the resident's official duty to summarize and document the medical care provided to the patient in the patient's medical record, and (2) the attending physician's official duty to complete her own documentation in the patient's medical record reflecting her "involvement and assessment related to the patient's care." Plaintiff did not, however, respond by offering evidence sufficient to raise an issue of fact as to whether the post-visit notes concerning the care provided to plaintiff, or any part of those notes, were made outside the scope of MacDonald's or Bernard's official duties.

To avoid summary judgment after OHSU produced evidence that the notes were entered as part of each physician's respective role in delivering healthcare services to plaintiff—*prima facie* evidence that absolute privilege applies—plaintiff needed to have come forward with evidence that the physicians did not enter their respective notes within the course of their official duties. Plaintiff did, of course, offer evidence through Bernard's deposition

testimony that Bernard's note incorrectly states that she personally saw plaintiff and that plaintiff "obtained duplicate prescriptions." But the fact that Bernard's note was incorrect in those respects does not raise an issue of fact about whether the physicians were carrying out their official duties when they created and entered the post-visit notes.[4]

There is evidence that MacDonald and Bernard were carrying out their official duties delivering healthcare to plaintiff at OHSU, a public corporation providing statewide healthcare services and education as a part of state government. There is evidence that, as a part of the delivery of healthcare services to plaintiff, MacDonald and Bernard had a duty to, and did, summarize the care they provided to her and entered those summaries into her medical record. There is no evidence that raises a genuine issue about whether McDonald or Bernard were carrying out their official duties in doing so and on this record, OHSU is entitled to prevail on its absolute privilege defense. The trial court did not err in granting summary judgment to OHSU on the defamation claim.

## THE MEDICAL NEGLIGENCE CLAIM

We turn to the trial court's order granting summary judgment on plaintiff's negligence claim in favor of OHSU. As noted, we view the record in the light most favorable to plaintiff, resolving all reasonable inferences in her favor. *Jennewein*, 308 Or App at 400. Summary judgment is to be granted only when there are no genuine issues of material fact, and the moving party is entitled to prevail as a matter of law. ORCP 47 C.

As a preliminary matter, OHSU raises a preservation argument that we reject. OHSU raised the legal sufficiency of the facts supporting plaintiff's negligence claim in its motion for summary judgment and, having opposed that

---

[4] We note that the ORCP 47 E affidavit submitted by plaintiff's counsel was submitted in opposition to OHSU's motion for summary judgment on plaintiff's medical negligence claim. She did not argue in the trial court that that affidavit raises a material issue with respect to the application of absolute privilege and we do not understand her to make that argument on appeal.

motion in the trial court, plaintiff placed the matter squarely at issue, preserving her arguments for appeal. However, to the extent that plaintiff now argues that the court should have granted her leave, *sua sponte*, to further amend her second amended complaint following its granting of OHSU's motion for summary judgment, we agree with OHSU that she did not preserve that argument and we, therefore, do not address it on appeal.

Although the sufficiency of plaintiff's complaint was at one time tested in the trial court by a *former* ORCP 21 A(8) (2018)[5] motion, the court's ruling on that motion is not before us. Plaintiff argues that OHSU's motion for summary judgment "operated as a [*former*] ORCP 21 A(8) motion to dismiss for failure to state a claim for relief." We disagree with that characterization. OHSU argued, and the trial court found, that the evidence before it on the summary judgment motion was insufficient to raise an issue of material fact, thus entitling OHSU to prevail as a matter of law. We look to that record—which includes both the pleadings and the evidence presented—as we review the trial court's summary judgment ruling.

One typically may recover damages for injuries that are the reasonably foreseeable result of another person's careless conduct. *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P3d 1326 (1987) ("[T]he issue of liability for harm actually resulting from [a] defendant's conduct [typically] depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."). A plaintiff in a professional negligence case must ordinarily plead and prove

> "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, *i.e.*, a causal link between the breach of duty and the harm."

*Zehr v. Haugen*, 318 Or 647, 653-54, 871 P2d 1006 (1994). A cause of action for negligence does not arise until the

---

[5] ORCP 21 A(8) was renumbered as ORCP 21 A(1)(h), effective January 1, 2022. We cite the former version in this opinion. It authorizes motions to dismiss for "failure to state ultimate facts sufficient to constitute a claim."

defendant's negligent conduct causes harm that results in damages. *Berg v. Hirschy*, 206 Or App 472, 475, 136 P3d 1182 (2006).

In negligence cases, "harm" generally means "physical injury." *See, e.g.*, *Branch v. Hensgen*, 90 Or App 528, 531, 752 P2d 1275, *rev den*, 306 Or 527 (1988) (explaining that in a medical negligence case, "[i]njury in the legal sense means physical injury" (internal quotation marks omitted)). Proof of physical injury or, alternatively, breach of a heightened duty of care, is required in cases seeking damages for emotional injury. *Wilson v. Tobiassen*, 97 Or App 527, 532, 777 P2d 1379, *rev den*, 308 Or 500 (1989) (explaining that the physical injury rule provides assurance that the mental disturbance is genuine and permits the courts to distinguish legitimate claims from speculative ones). In other words, foreseeability alone is insufficient to establish liability. And, in the absence of physical injury, "there must also be another 'legal source' of liability for the plaintiff to recover emotional distress damages." *Philibert v. Kluser*, 360 Or 698, 703, 385 P3d 1038 (2016) (quoting *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 569, 652 P2d 318 (1982)).

A "direct physician-patient relationship" can be the legal source justifying a duty to protect "economic and emotional interests under negligence law." *Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 443, 412 P3d 133 (2018). And there is no dispute here that this is a professional negligence claim that invokes the standard of care for physicians set forth at ORS 677.095(1):

> "A physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community."

But a physician does not "operate under a general duty to avoid any emotional harm that foreseeably might result from their conduct." *Curtis v. MRI Imaging Services II*, 327 Or 9, 15, 956 P2d 960 (1998). To recover damages from one's physician for emotional harm in the absence of physical injury, the physician's standard of care must include a

"specific duty to be aware of and guard against particular adverse psychological reactions or consequences to medical procedures." *Id.* at 14-15. The interest must be "of sufficient importance as a matter of policy to merit protection from emotional impact." *Hilt v. Bernstein*, 75 Or App 502, 515, 707 P2d 88 (1985), *rev den*, 300 Or 545 (1986). Such instances generally include (1) "when another party has a legal duty 'designed to protect plaintiff[] against the type of harm'" that occurred; (2) when a legally protected interest has been created by statute to prevent "the type of emotional harm that occurred"; and (3) when the interest has previously been given protection under the common law. *Philibert*, 360 Or at 705-06 (brackets in *Philibert*).

Here, plaintiff argues that, as a patient, she has a "legally protected interest in the accuracy of her medical records" and in having inaccurate medical records corrected. In support of that, she points to various federal and state statutory provisions that protect personal health information contained within a patient's medical records from unauthorized disclosure and that provide a process for patients to request corrections to their medical records. OHSU counters that exceptions to the physical injury requirement are narrow, and further, that plaintiff did not allege "that the standard of care for the alleged malpractice (here, record keeping) included a duty to guard against the patient's psychic harm," and in any event plaintiff failed to "provide evidence of a standard of care that requires medical providers to protect against psychic harm when completing chart notes and medical records."

Plaintiff relies on ORS 192.553(1)[6] in support of her contention that "medical records clearly qualify as a legally protected interest." She also mentions ORS 677.190(4) (relating to the regulation of medicine) and ORS 165.080 (relating to the falsification of business records), but she does not

---

[6] ORS 192.553(1) provides:

"It is the policy of the State of Oregon that an individual has:

"(a) The right to have protected health information of the individual safeguarded from unlawful use or disclosure; and

"(b) The right to access and review protected health information of the individual."

develop her argument based on those provisions. And as OHSU points out, neither the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Standards for Privacy of Individually Identifiable Health Information (the Privacy Rule), nor the corresponding Oregon statutes create a right of recovery in individuals for the wrongful violation of those provisions.

Plaintiff does not demonstrate how the right to privacy that attaches to one's medical records and the corresponding rights of access and correction give rise to liability in negligence for psychological damages, in the absence of physical damage, caused by a physician's failure to maintain accurate medical records. She has not alleged or offered evidence sufficient to connect her physicians' duty to use that degree of care, skill, and diligence used by similarly situated physicians in assessing and treating movement disorders to a specific duty to maintain accurate patient records for the specific purpose of protecting patients from emotional harm that might arise from poor record-keeping practices. And it is not our function to sort out and develop such arguments for plaintiff given the record before us. *See R. S. R. v. Dept. of Human Services*, 319 Or App 149, 161, 510 P3d 209 (2022) ("It is insufficient for plaintiff to merely identify those authorities and task us with determining how, under controlling case law, they apply to his case."); *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be" or "to make or develop a party's argument when that party has not endeavored to do so itself.").

The ORCP 47 E affidavit submitted by plaintiff's counsel in response to OHSU's summary judgment motion does not assist plaintiff. Although we view that affidavit "like all parts of the record, in the light most favorable to plaintiffs," *Two Two*, 355 Or at 331, it does not defeat summary judgment where, as here, plaintiff did not develop or support her arguments concerning whether there is an interest in the accuracy of one's medical records sufficiently important to provide an exception to the physical injury rule that applies to negligence cases.

CONCLUSION

The trial court did not err in granting OHSU's summary judgment motions as to plaintiff's defamation and medical negligence claims. Therefore, we affirm.

Affirmed.