Argued and submitted September 7, 2021; reversed in part and remanded, otherwise affirmed June 23, 2022

Leslie C. HARMON II,
as Personal Representative of the
Estate of Annita Shirley Harmon,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
acting by and through the
Psychiatric Security Review Board,
acting by and through the
Oregon State Hospital,
*Defendant-Respondent,*

*and*

Mukesh MITTAL, M.D.,
*Defendant.*

Multnomah County Circuit Court
18CV58438; A172674

514 P3d 1131

Plaintiff, on behalf of the decedent, brought this wrongful death action against the state—acting by and through the Psychiatric Security Review Board (PSRB) and the Oregon State Hospital (OSH)—after the decedent was killed by an individual, Montwheeler, who had recently been released from the jurisdiction of PSRB and released from commitment at OSH. Plaintiff alleged the state was negligent in myriad ways, including in releasing Montwheeler; in its treatment, testing, and assessment of Montwheeler; and in its failure to warn the decedent about Montwheeler's release. The trial court granted the state's motion for summary judgment, concluding quasi-judicial immunity barred plaintiff's claim. *Held*: Quasi-judicial immunity barred plaintiff's negligence claim against the state arising from PSRB's and OSH's release of Montwheeler and with regard to PSRB's assessment of the Montwheeler's mental health. But the state was not entitled to quasi-judicial immunity with regard OSH's assessment of Montwheeler's mental health. Nor was the state entitled to quasi-judicial immunity with regard to claims that the state was negligent in its treatment and testing of Montwheeler or in its failure to warn the decedent of Montwheeler's release.

Reversed in part and remanded; otherwise affirmed.

Angel Lopez, Judge.

Travis Eiva argued the cause and filed the briefs for appellant.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Egan, Judge, and Aoyagi, Judge.*

EGAN, J.

Reversed in part and remanded; otherwise affirmed.

_____

* Egan, J., *vice* Armstrong, S. J.

**EGAN, J.**

Plaintiff, personal representative of the estate of Annita Shirley Harmon, brought this wrongful death action against the State of Oregon, acting by and through the Psychiatric Security Review Board (PSRB) and the Oregon State Hospital (OSH), after Harmon was killed by her ex-husband Anthony Montwheeler following his discharge from the jurisdiction of PSRB and release from OSH. Plaintiff's complaint alleged that the state, acting by and through PSRB and OSH, was negligent in myriad ways, including with regard to its treatment through medication, psychological testing, assessment, and release of Montwheeler, as well as in failing to warn Harmon about Montwheeler's release. The trial court granted summary judgment to the state on the basis that quasi-judicial immunity barred plaintiff's claim. In her sole assignment of error, plaintiff contends that the trial court erred in granting the state's motion for summary judgment.

For the reasons explained below, given the summary judgment record in this case and the allegations in the complaint, we conclude that the trial court did not err in concluding that quasi-judicial immunity barred plaintiff's negligence claim against the state arising from PSRB's and OSH's release of Montwheeler.[1] PSRB's determination regarding whether to discharge an individual from its jurisdiction shares enough of the characteristics of the judicial process that the state is entitled to quasi-judicial immunity regarding PSRB's acts or omissions in making that determination, and quasi-judicial immunity likewise immunizes the state from liability for OSH's compliance with PSRB's release decision. Moreover, the trial court did not err when it concluded that the state is entitled to quasi-judicial immunity with regard to PSRB's assessment of Montwheeler's

---

[1] In this opinion, we discuss the applicability of the doctrine of quasi-judicial immunity to the state for actions undertaken by PSRB and OSH. In doing so, we are mindful that the quasi-judicial immunity enjoyed by the state in this case arises from whether PSRB and OSH would enjoy such immunity, which in turn arises from whether individual employees of PSRB and OSH would enjoy such immunity for their conduct. Nevertheless, given the way the complaint in this case frames the claims at issue and the summary judgment record, in this opinion we refer to conduct allegedly undertaken by PSRB and OSH, rather than conduct undertaken by the employees thereof.

mental health—PSRB's release decision *is* its assessment of Montwheeler's mental health, and the state is entitled to quasi-judicial immunity regarding that decision by PSRB. However, we conclude that the state is not entitled to quasi-judicial immunity with regard to OSH's treatment through medication, psychological testing, and assessment of Montwheeler. The treatment of mental illness through medication, psychological testing, and assessment of mental health by OSH are not functionally comparable to judicial actions. Further, to the extent that PSRB, outside of its quasi-judicial role, engaged in treatment of Montwheeler through medication or psychological testing of Montwheeler, the state is not entitled to quasi-judicial immunity for those acts by PSRB.[2] Finally, given the record in this case, we conclude that the state is not entitled to quasi-judicial immunity for PSRB's and OSH's failure to warn Harmon of Montwheeler's release.

Consequently, we reverse in part and remand.

## I.  ISSUES PRESENTED AND STANDARD OF REVIEW

To frame our analysis, we start by identifying what is—and is not—at issue in this appeal, as well as the legal standards that govern our review of the trial court's resolution of the issues presented.

As noted above, plaintiff alleges that the state was negligent in its treatment through medication, psychological testing, assessment, and release of Montwheeler, as well as in failing to warn Harmon about Montwheeler's release. The state's motion for summary judgment did not put at issue plaintiff's ability to prove those allegations of negligence or

---

[2] Plaintiff's complaint alleges that the state, acting by and through PSRB, was negligent in failing to treat Montwheeler through implementation of a reasonable medication management program and failing to "test or reasonably perform psychological testing" on Montwheeler.

On appeal, the state argues that it was entitled to summary judgment in part because the PSRB was not authorized to undertake those acts. As explained below, to the extent that the state is correct that PSRB is not authorized to implement a medication management program or perform psychological testing—and we have no reason to believe that the state is not correct in that assertion—that may provide a future basis for summary judgment (or other appropriate motion), but it was not the basis for the state's existing summary judgment motion in the trial court.

whether those allegedly negligent acts resulted in the harm alleged. The only issue raised in the motion with respect to actions taken by the state was whether, with regard to all of the allegations of negligence made by plaintiff, absolute quasi-judicial immunity barred plaintiff from recovering.[3] Consequently, for purposes of this appeal, "we assume that [the state] was negligent in each of the manners alleged," *Robbins v. City of Medford*, 284 Or App 592, 595, 393 P3d 731 (2017), and assume that that negligence resulted in the harm alleged, *Westfall v. Dept. of Corrections*, 355 Or 144, 156, 324 P3d 440 (2014) ("Because the trial court granted summary judgment for the state based on its claim of discretionary immunity, we assume for purposes of analysis that the department's policy did result in a prison term calculation that was inconsistent with what the Josephine County Circuit Court had intended by the sentence it imposed."). The sole question is the state's entitlement to absolute quasi-judicial immunity for the assumedly negligent acts and omissions. ORCP 47 C; *Eklof v. Steward*, 360 Or 717, 731, 385 P3d 1074 (2016) (the only issues properly before a court on summary judgment are those raised in the motion for summary judgment). We do not consider—and we express no opinion on—whether other immunity doctrines might bar plaintiff's claim. *See Hofer v. OHSU*, 319 Or App 603, 609 n 3, 511 P3d 414 (2022) ("OHSU, however, does not claim that qualified privilege applies and we, therefore, address only the question of the applicability of absolute privilege.").[4]

---

[3] The state also argued in its motion for summary judgment that Dr. Mukesh Mittal, one of Montwheeler's treating psychiatrists, was "entitled to absolute privilege for his testimony made before the PSRB." That issue is not before us on appeal.

[4] On appeal, the state argues that Harmon's death was not a foreseeable result of Montwheeler's release. But foreseeability was not a ground on which the state moved for summary judgment in the trial court; therefore, we reject the state's foreseeability argument as a basis for affirmance. *See Eklof*, 360 Or at 730 ("'Parties seeking summary judgment must raise by motion the issues on which they contend they are entitled to prevail as a matter of law. Parties opposing summary judgment have the burden of producing evidence that creates a material issue of fact as to *those issues, but only as to those issues.*'" (Quoting *Two Two v. Fujitec America, Inc.*, 355 Or 319, 326, 325 P3d 707 (2014); emphasis in *Eklof*.)).

Similarly, on appeal, the state argues that plaintiff cannot prove causation, because "any pre-release failures in treating, assessing, or supervising Montwheeler were not causally related to Harmon's death," and, more specifically, "if Harmon's death can be causally traced to Montwheeler's release, then

We turn to the applicable standard of review. As noted, the trial court resolved the issue of the state's entitlement to quasi-judicial immunity on summary judgment. "On review of a grant of summary judgment, we must view the summary judgment record in the light most favorable to the nonmoving party—in this case, plaintiff—and determine whether there are genuine issues of material fact" and whether the state, "as the moving party, is entitled to judgment as a matter of law on the ground of" quasi-judicial immunity. *Robbins*, 284 Or App at 595-96. The summary judgment record "includes both the pleadings and the evidence presented." *Hofer*, 319 Or App at 615.

Further, because quasi-judicial immunity is an affirmative defense for which the state would have the burden of proof at trial, *Jones-Clark v. Severe*, 118 Or App 270, 273, 846 P2d 1197 (1993), "summary judgment is appropriate only if [the state] establishes all of the elements of the defense as a matter of law," *Robbins*, 284 Or App at 596 (internal quotation marks omitted). "Our task on appeal, as circumscribed by our standard of review, is to determine whether the uncontroverted evidence presented by defendant in support of its motion for summary judgment is such that all reasonable factfinders would have to find in defendant's favor on its affirmative defense of" quasi-judicial immunity. *Id.* (internal quotation marks and brackets omitted). "In other words, we must be able to conclude that no reasonable factfinder could reject defendant's defense." *Id.* (internal quotation marks omitted). Because plaintiff's allegations of negligence challenge several distinct alleged acts and omissions by the state, "we consider [the state's]

that release can be causally traced solely to the PSRB's release order, and any anterior links in that chain of causation—such as OSH's treatment and assessments—are too tenuous to support a verdict in plaintiff's favor." That proffered basis for affirming the trial court's grant of summary judgment presents a materially different issue from the issue raised by the state's motion for summary judgment. We consequently reject the state's causation argument as a basis for affirmance.

Finally, we note that, in its brief on appeal, in a footnote, the state argues that "even if OSH was not entitled to absolute immunity against plaintiff's allegations, it was entitled to qualified immunity." But qualified immunity was not raised in the state's motion for summary judgment and the state's undeveloped qualified immunity argument on appeal likewise does not provide a basis to affirm.

entitlement to [quasi-judicial] immunity with respect to each act or omission alleged to be negligent." *Id.*

## II.   THE FUNCTION OF PSRB AND OSH

At the outset, we briefly explain the roles of PSRB and OSH, as helpful to an understanding of the facts and our analysis of the application of quasi-judicial immunity.

### A.   *PSRB*

PSRB is a state agency created by ORS 161.385. Pursuant to ORS 161.327, if the court finds that a person found guilty except for insanity of a felony is "affected by a qualifying mental disorder" and presents a "substantial danger to others," and the court "finds that the person is not a proper subject for conditional release," the court is required to "order the person committed to a state hospital" and "place the person under the jurisdiction" of PSRB.[5] A corollary of ORS 161.327, OAR 859-030-0010, provides that the PSRB "will take jurisdiction over persons adjudged by the court to be guilty except for insanity and who present a substantial danger to others."

ORS 161.351 requires that PSRB discharge any person placed under its jurisdiction if, after a hearing, PSRB "finds by a preponderance of the evidence that the person is no longer affected by a qualifying mental disorder or, if so affected, no longer presents a substantial danger to others that requires regular medical care, medication, supervision or treatment."

A discharge hearing can be initiated when the superintendent of the hospital where the person is committed applies to PSRB for an order of discharge. ORS 161.341(1) provides:

> "If at any time after a person is committed * * * to a state hospital * * * the superintendent of the hospital * * * is of the opinion that the person is no longer affected by

---

[5]

"A person is guilty except for insanity if, as a result of a qualifying mental disorder at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law."

ORS 161.295.

a qualifying mental disorder, or, if so affected, no longer presents a substantial danger to others *** the superintendent *** shall apply to the Psychiatric Security Review Board for an order of discharge ***."

A discharge hearing can also be initiated if a person committed to a state hospital and under the jurisdiction of PSRB applies for an order of discharge. ORS 161.341(3) provides:

"Any person who has been committed to a state hospital, *** or another person acting on the person's behalf, may apply to the board for an order of discharge or conditional release upon the grounds:

"(a)   That the person is no longer affected by a qualifying mental disorder;

"(b)   That the person, if so affected, no longer presents a substantial danger to others; or

"(c)   That the person continues to be affected by a qualifying mental disorder and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release."

When the superintendent applies for an order of discharge under ORS 161.346(1), the application must be accompanied "by a report setting forth the facts supporting the opinion of the superintendent or director." Similarly, when a person committed to a state hospital, or another person acting on behalf of the committed person, applies for an order of discharge under ORS 161.346(3), PSRB "shall require that a report from the superintendent of the hospital be prepared and transmitted" containing the opinion of the superintendent as to the discharge of the committed person. ORS 161.341(4).

When an application for an order of discharge is made under ORS 161.341(1) or ORS 161.341(3), PSRB must hold a hearing pursuant to ORS 161.346.[6] That statute

---

[6] We note that there are certain restrictions on the timing of requests for discharge under ORS 161.341(3).

We also note that the statutory scheme further provides that no person may be held for more than two years without a hearing by PSRB to determine whether the person should be discharged or conditionally released. ORS 161.341(6).

requires that, at the hearing, the board "consider all evidence available to it that is material, relevant and reliable regarding the issues before the board." ORS 161.346(3). It also requires that the person about whom the hearing is conducted, their attorney, the Attorney General, and the district attorney of the county from which the person was committed, receive notice of the hearing. ORS 161.346(4).

Further, the person about whom the hearing is being held has the right:

"(a)   To appear at all proceedings held \*\*\*, except for deliberations.

"(b)   To cross-examine all witnesses appearing to testify at the hearing.

"(c)   To subpoena witnesses and documents \*\*\*.

"(d)   To be represented by suitable legal counsel possessing skills and experience commensurate with the nature and complexity of the case, to consult with counsel prior to the hearing and, if financially eligible, to have suitable counsel appointed at state expense.

"(e)   To examine all information, documents and reports that the board considers."

ORS 161.346(6).

After the hearing conducted pursuant to ORS 161.346, PSRB must enter an order with findings in support of the order:

"If the board finds that a person under the jurisdiction of the board:

"(a)   Is no longer affected by a qualifying mental disorder, or, if so affected, no longer presents a substantial danger to others, the board shall order the person discharged from commitment \*\*\*.

"\*\*\*\*\*

"(c)   Has not recovered from the qualifying mental disorder, is a substantial danger to others and cannot adequately be controlled if conditionally released on supervision, the board shall order the person committed to, or retained in, a state hospital."

ORS 161.346(1)(a), (c).

B.  *OSH*

OSH is a mental health hospital operated and managed by the Oregon Health Authority. ORS 179.321(1). It is used by the state "for the care and treatment of persons with mental illness." ORS 426.010. As we explained in *Adams v. PERB*, 180 Or App 59, 68, 42 P3d 911 (2002), people under the care of OSH come to OSH through various avenues: "They may have been civilly committed, transferred from a correctional facility or a youth correctional facility, placed within the jurisdiction of the PSRB after being found guilty except for insanity, or ordered by a court for evaluation."

## III.   HISTORICAL AND PROCEDURAL FACTS

With that background, we turn to the facts and procedural history of the instant case.

A.  *Montwheeler's 1996 Conduct and Adjudication*

In April 1996, Montwheeler held his then-wife, R, and their three-year-old son hostage for approximately five hours while armed with a rifle; in the course of those events, he threatened his family with the rifle, threatened to drown his son, and fired his rifle toward police. As a result of that conduct, Montwheeler was charged with two counts of first-degree kidnapping with a firearm, as well as six counts of unlawful use of a firearm. Montwheeler was adjudicated guilty except for insanity in 1997, placed under the jurisdiction of PSRB for a period not to exceed 70 years, and admitted to OSH.

B.  *Montwheeler's Time under the Jurisdiction of PSRB*

For much of the time Montwheeler was under the jurisdiction of PSRB he was committed to OSH.[7] Records show that while at OSH Montwheeler was diagnosed with "many mental illnesses," and primarily "bipolar disorder." However, early in his time at OSH, in 1997, a clinician indicated that there was "a reasonable medical probability that

---

[7] While under PSRB jurisdiction, Montwheeler spent approximately 10 years in the community on conditional release, where, although he did not exhibit violent behavior, he engaged in criminal activity, was adjudicated for that criminal activity and spent time in the custody of the Department of Corrections and was ultimately returned to OSH.

[Montwheeler] may have simulated symptoms in order to avoid the prison system [and] get into the mental health care system instead."

At times while under the jurisdiction of PSRB, Montwheeler took medication for bipolar disorder, but OSH discontinued Montwheeler's medication in October 2015.

While Montwheeler was at OSH, treatment providers performed periodic assessments of the risk of violence he posed. A July 2016 "risk assessment," for example, stated that Montwheeler was a "low risk for violent acts in an institutional setting, and a moderate risk for violence in the community if under supervision," but that if Montwheeler was "in the community without supervision, his risk of violence would be high, and would most likely be targeted at his intimate partner or other family members."

On October 13, 2016, a psychiatrist treating Montwheeler, Dr. Mukesh Mittal, completed a "progress note" in which, after a review of records regarding Montwheeler—including thousands of pages of documents—he concluded that Montwheeler "more than likely does not have a qualifying mental illness" and "therefore, does not satisfy the criteria for PSRB jurisdiction."

The next day—on October 14, 2016—Montwheeler's counsel sent a letter to PSRB requesting a hearing for Montwheeler's discharge from PSRB jurisdiction.

Shortly thereafter, on October 25, 2016, OSH conducted a "risk review." The report generated as a result of that assessment explained that the interdisciplinary team responsible for the risk assessment would request "Jurisdictional Discharge Review for Mr. Montwheeler" because they believed that he "was improperly placed under the jurisdiction of the PSRB," "does not suffer from mental illness," and "would be more appropriately placed outside the hospital." That report indicated that, during his time at OSH, Montwheeler had never "displayed any symptoms indicative of a mental disease or defect" and explained that, after his 1996 crimes, Montwheeler's "attorney gave him a copy of the DSM and coached him well on how to act as if

he had a mental illness." It opined that, if placed "unsupervised in the community, it is probable that [Montwheeler] would engage in substantially dangerous behavior, such as defrauding vulnerable individuals," but that that "substantially dangerous behavior" would be caused by his personality disorder, not a mental disease or defect. The risk review also indicated that, "if he is given a jurisdictional discharge, he wants to return to his wife."

The summary judgment record also contains evidence that Montwheeler anticipated his release from PSRB jurisdiction prior to PSRB making the decision to release Montwheeler.

## C.  *PSRB Discharges Montwheeler from its Jurisdiction*

On December 7, 2016, PSRB held a hearing pursuant to ORS 161.341(1). Montwheeler's attorney requested discharge on behalf of Montwheeler, arguing that "Montwheeler no longer suffered from a qualifying mental disease or defect and therefore must be discharged from the Board's jurisdiction." An assistant attorney general, appearing on behalf of the state, opposed the request for discharge. PSRB heard testimony and received 227 exhibits.

In a written order of discharge, dated December 14, 2016, PSRB determined that "the State did not sustain its burden of proving by a preponderance of the evidence that *** Montwheeler continues to be affected by a mental disease or defect." Among the evidence to which PSRB pointed in the order of discharge was testimony from Mittal that, although Montwheeler had "carried a diagnosis of Bipolar Disorder" for "approximately 20 years, there have been no psychiatric symptoms observed or reported during [that] time [that] validate this diagnosis" and testimony "to the effect that Mr. Montwheeler does not suffer from a qualifying mental disease or defect." PSRB's order also notes that Mittal's conclusion regarding Montwheeler was supported by the "O.S.H. Risk Review Panel decision recommending a jurisdictional discharge for Mr. Montwheeler."[8]

---

[8] PSRB's order also noted that "Montwheeler regularly reports to O.S.H. staff that he has been malingering symptoms of a mental illness in order to stay out of prison and receive housing."

The order of discharge concludes, "as a matter of law," that "pursuant [to] ORS 161.346(1)(a)," Montwheeler "must be discharged from the jurisdiction of the [PSRB]."

The state does not dispute that Harmon was not notified by PSRB or OSH about Montwheeler's release. Evidence presented during the summary judgment proceeding reflects that what notice people receive about release of an individual from PSRB jurisdiction (if such notice were to occur) would be an "administrative function" of PSRB, as opposed to a "deliberative" function.

D.   *Montwheeler's Release and Subsequent Crimes*

After the PSRB discharged Montwheeler from its jurisdiction, Montwheeler was released from his commitment at OSH. Shortly thereafter, in January 2017, Montwheeler kidnapped Harmon and stabbed her to death.[9] In fleeing from that crime, he was involved in a vehicle accident in which a second person was killed, and a third person was injured. As a result of that conduct, Montwheeler was charged with various crimes.

E.   *The Instant Litigation*

In December 2018, the personal representative for Harmon filed this action against the state, alleging a single count of wrongful death. Paragraph 16 of the complaint alleged that the state, acting by and through PSRB and OSH, was negligent in the following ways:

"(a) In failing to have and implement a reasonable medication management program when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general;

"(b) In failing to reasonably assess Montwheeler's mental health condition before releasing him on or about December 7, 2016, when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law

---

[9] We note that Harmon was Montwheeler's fourth wife and is a different person from R, who was Montwheeler's earlier wife and the victim of Montwheeler's 1996 crimes.

and that he posed a foreseeable threat of harm to Annita Harmon and society in general;

"(c)   In failing to test or reasonably perform psychological testing on Montwheeler when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a threat to Annita Harmon and society in general;

"(d)   In releasing Montwheeler on December 7, 2016, when the defendants knew, or in the exercise of reasonable care should have known, that they did not possess sufficient information to make a decision that would support releasing him to the public after 19 years in the jurisdiction of the state mental hospital;

"* * * * *

"(g)   In releasing Montwheeler without properly training or supervising its employees as to the proper standards for evaluating the mental health of its residents, including specifically Montwheeler, when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general;

"* * * * *

"(i)   In failing to warn Annita Harmon that Montwheeler was in her community and presented a foreseeable risk of harm to her while he was not subject to state assessment, reporting, monitoring, accountability or control when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general."[10]

The complaint further alleged that "the negligence of defendants," as alleged in paragraph 16(a) through (i), "was a substantial factor in causing the pre-mature death of Annita Harmon."

---

[10] On appeal, plaintiff has abandoned the allegations of negligence contained in the omitted paragraphs, (e), (f), and (h). We note that the complaint refers to "defendants" (plural), but that, technically, there is only one defendant named in the complaint that was the subject of the state's summary judgment motion, the state, acting by and through PSRB and OSH.

The state answered plaintiff's complaint and, on the same day, moved for summary judgment "based upon judicial and/or quasi-judicial immunity," submitting, as its sole exhibit in support, PSRB's order of discharge. In its motion, the state argued that "the Order of Discharge constituted a permissible exercise of quasi-judicial authority by the PSRB, [OSH] was privileged in complying with the Order of Discharge made [by] the PSRB, *** the PSRB had the exclusive authority and jurisdiction to enter the Order of Discharge," and "the employees or agents of [OSH] did not make the decision [that was] the subject of the order of discharge." In the state's view, the "employees and agents of the PSRB are entitled to absolute immunity from civil claims for damages with regard to the decision making and entry of the Order of Discharge" and "employees or agents of the Oregon State Hospital are absolutely immune from civil claims for damages in complying with the Order of Discharge."

In response, plaintiff argued that OSH and PSRB are "distinct," that "OSH has absolutely no judicial or quasi-judicial function," and that therefore "OSH cannot be absolutely immune." Plaintiff pointed out that the complaint includes allegations about "failure to train and to notify," which occurred "before and after" the December 7, 2016, hearing. Plaintiff also argued—pointing to evidence that Montwheeler and others anticipated his release from PSRB jurisdiction prior the PSRB hearing—that "PSRB cannot show that the December 7, 2016, hearing was the reason for Montwheeler's release"; that a jury could infer "the hearing was neither an adjudication nor a deliberation" and was not "quasi-judicial activity"; and that the hearing "bordered on sham."

The trial court granted the state's motion for summary judgment, reasoning that "PSRB engaged in a quasi-judicial *** function in having [the] hearing, *** and considering the record, and making the decision," and that nothing in the record suggested that PSRB was in "such abdication of [its] function" that it would take PSRB "out of any kind of protection." The court then entered a limited judgment of dismissal, which plaintiff appeals.

## IV.   ANALYSIS

As noted above, plaintiff's sole assignment of error is that the trial court erred in granting the state's motion for summary judgment. As also noted, the trial court granted that motion on the basis of quasi-judicial immunity. We therefore describe the doctrine of quasi-judicial immunity before turning to its application with regard to the specific allegations of negligence in this case.

### A.   *Quasi-Judicial Immunity*

"Judicial immunity has long been a part of the immunities afforded public officials." *Praggastis v. Clackamas County*, 305 Or 419, 426, 752 P2d 302 (1988); *see also id.* (noting judicial immunity is mentioned in the Book of Assizes, 27 Edw. III, pl. 18 (1354)). In *Praggastis*, the Supreme Court explained the policy underpinnings of judicial immunity:

> "[T]here is a public good to be gained from the principled and fearless decision-making of judicial officers freed from concern over suits by disappointed litigants. To gain this good, it is necessary to cloak judicial officers with immunity from civil liability for their acts, so long as these acts are within the jurisdiction of the officer."

*Id.*

"Judicial immunity depends on the performance of a judicial function." *Id.* at 427. Thus, "[j]udicial immunity is granted or withheld on the basis of the nature of the function being performed, and not on the basis of the office." *Id.*; *see Butz v. Economou*, 438 US 478, 511, 98 S Ct 2894, 57 L Ed 2d 895 (1978) ("Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities."). "When such judicial functions are performed by a public officer other than a judge, the immunity is often referred to as quasi-judicial immunity, but this is a distinction of name and not a distinction of immunity." *Praggastis*, 305 Or at 426; *see also Ramstead v. Morgan*, 219 Or 383, 388, 347 P2d 594 (1959) ("The absolute immunity attaches to statements made in the course of, or incident to a judicial proceeding. * * * The rule of absolute privilege is applicable not only to judicial proceedings but to quasi-judicial proceedings as

well.").  For example, we have stated that the "decisions of a parole board" are subject to such immunity. *Jones-Clark*, 118 Or App at 274.

> "Several factors are commonly examined to determine if a particular duty can be considered judicial or quasi-judicial for the purpose of extending immunity to the official performing the action." *Praggastis*, 305 Or at 426. Those factors include

> "whether the official's actions are functionally comparable to judicial actions or involve decisions normally performed by judges in their judicial capacity, whether the action depends on legal opinions or discretionary judgments comparing the facts of a present situation with general legal questions, and whether the acts in question are primarily concerned with the official's role as a judicial or quasi-judicial officer."

*Id.*

In a seminal case concerning judicial immunity, *Butz*, the United States Supreme Court held that, under federal law, "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." 438 US at 512-13. Among those shared characteristics are that the "conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court," that "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process," and that the "transcript of testimony and exhibits together with the pleadings constitute the exclusive record for decision." *Id.* at 513. The Court explained that "the role of the modern federal hearing examiner or administrative law judge within this framework is 'functionally comparable' to that of a judge." *Id.* The Court also held that "agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts" so that they can "make the decision to move forward with an administrative proceeding free from intimidation or harassment." *Id.* at 515-16.

Following *Butz*, both we and our Supreme Court have explored the contours of the doctrine of judicial immunity in a number of cases. We have held, for example, that judicial immunity "extends to prosecutors for acts performed in initiating prosecutions," and that a prosecutor is "absolutely immune with respect to his or her decision as to when, how, and against whom to proceed." *Heusel v. Multnomah County D.A.'s Office*, 163 Or App 51, 56, 989 P2d 465 (1999) (internal quotation marks omitted). Similarly, in the context of judicial immunity under 42 USC section 1983, in *Tennyson v. Children's Services Division*, 308 Or 80, 775 P2d 1365 (1989), the Supreme Court held that child protective agency caseworkers were entitled to absolute immunity when filing petitions that initiate juvenile court proceedings, because that act was analogous to a district attorney's initiation of a prosecution. *Id.* at 88. The Supreme Court also held that child protective agency caseworkers were entitled to absolute immunity when testifying in court, because witnesses are an "integral part of the judicial process." *Id.* In contrast, the caseworkers were not entitled to absolute immunity against 42 USC section 1983 claims when performing investigations, taking children into custody and limiting parents' visitation. *Id.* at 89. The court explained that "investigating abuse is not an integral part of the judicial process," because an investigation "may lead no further or may lead to action not involving the court"; that taking a child into custody was not "an integral part of the judicial process because *** defendants need not have involved the court"; and that, unless ordered to do so by a court, "limiting visits [is] not integral to the judicial process." *Id.* (internal quotation marks omitted).[11]

In addition to providing immunity for "judicial functions," judicial immunity also immunizes acts "performed under a court order or directive," so long as the court order or directive is "a permissible exercise of judicial authority" and the acts "comply with the court order or directive." *Fay v. City of Portland*, 311 Or 68, 73-74, 804 P2d

---

[11] The court also held that, in the context of 42 USC section 1983 claims, the caseworkers may be entitled to "qualified immunity," which is the "norm for executive officials," when "performing investigations, taking children into custody and limiting parents' visitation." *Tennyson*, 308 Or at 85, 89.

1155 (1991). However, "[a] judge has no authority to cloak the future decisions of others with his own immunity or to accomplish the same thing by signing a court order after the fact." *Mendive v. Children's Services Div.*, 102 Or App 317, 322, 794 P2d 807 (1990), *rev den*, 311 Or 87 (1991). In *Fossen v. Clackamas County*, 271 Or App 842, 849, 352 P3d 1288 (2015), for example, we concluded that the defendant, Clackamas County—which had arrested the plaintiff pursuant to an arrest warrant issued by a New York magistrate—was not entitled to quasi-judicial immunity. We explained that the arrest warrant "at most" immunized the defendant regarding the initial arrest made pursuant to the warrant, but that the defendant had continued to hold the plaintiff after the defendant "became aware that the factual basis for the arrest had completely evaporated," and that that action was not immune. *Id.* We also held that an order by a judge at an arraignment hearing setting a bail hearing for the plaintiff for the next day did not entitle the defendant to immunity because, "by the time of that court appearance" at arraignment, the defendant was aware there was no basis for the plaintiff's arrest, so the "wrongful imprisonment had already occurred." *Id.*

B. *Application in this Case*

    With that background, we turn to how the doctrine of quasi-judicial immunity applies with regard to the allegedly negligent acts and omissions in this case. We consider first the allegations related to release of Montwheeler, then the allegations concerning negligent treatment, testing, and assessment of Montwheeler, and, finally, the allegation concerning negligent failure to warn Harmon of Montwheeler's release.

    1. *Negligent release*

    Paragraphs 16(d) and (g) of plaintiff's complaint allege that the state, acting by and through PSRB and OSH, was negligent "in releasing" Montwheeler. More specifically, paragraph 16(d) provides that PSRB and OSH, "combining and concurring," acted negligently as follows:

    "(d)  In releasing Montwheeler on December 7, 2016, when the defendants knew, or in the exercise of reasonable

care should have known, that they did not possess sufficient information to make a decision that would support releasing him to the public after 19 years in the jurisdiction of the state mental hospital[.]"

We conclude that the trial court did not err when it concluded that the state had met its burden of establishing, as a matter of law, that the state is entitled to quasi-judicial immunity with regard to that allegation of negligence.

In our view, the state is entitled to quasi-judicial immunity for PSRB's decision to release Montwheeler from PSRB's jurisdiction. That is because PSRB's determination regarding whether to discharge an individual from its jurisdiction "shares enough of the characteristics of the judicial process," *Butz*, 438 US at 513, that PSRB is entitled to quasi-judicial immunity in making that determination. The decision to release Montwheeler was undertaken by PSRB in its quasi-judicial role: It occurred as a result of a hearing where PSRB heard testimony and received exhibits, and included numerous procedural safeguards, and where Montwheeler was represented by counsel. ORS 161.346(4). PSRB's decision to release Montwheeler was, therefore, "functionally comparable" to a "judicial action" and is properly understood to be a "judicial function." *Praggastis*, 305 Or at 426.

Similarly, given PSRB's discharge order, the state is entitled to quasi-judicial immunity for OSH releasing Montwheeler following PSRB's order of discharge. As noted above, in its order of discharge, the board concluded that, "pursuant [to] ORS 161.346(1)(a)," Montwheeler "must be discharged from the jurisdiction of the [PSRB]." We understand that order to have been an order effectively discharging Montwheeler from his commitment at OSH, *see* ORS 161.346(1)(a)—as OSH no longer had a basis to hold Montwheeler—and OSH's actions releasing Montwheeler were in accordance with that order. Just as judicial immunity attaches to acts "performed under a court order or directive," as long as the court order or directive is a "permissible exercise of judicial authority" and "the acts * * * comply with the court order or directive," *Fay*, 311 Or at 73-74, quasi-judicial immunity can attach to acts performed pursuant to a quasi-judicial order or directive. After all, the distinction

between "judicial immunity" and "quasi-judicial immunity" is a "distinction of name and not a distinction of immunity." *Praggastis*, 305 Or at 427.

In seeking a different result on appeal, plaintiff urges us to interpret the allegation of negligence in paragraph (d) contrary to its plain language. Plaintiff contends that her allegation that "the state was negligent in 'releasing' Montwheeler goes to the conduct of OSH before the Board's order of discharge" and that plaintiff's "theory of the case does not prosecute any claims that [PSRB] was negligent in its adjudicative order to discharge Montwheeler from PSRB jurisdiction or otherwise release him." But plaintiff's complaint—viewed as a whole—is not susceptible to the interpretation plaintiff puts forth on appeal. In that regard, we note that each of plaintiff's allegations of negligence in paragraph 16 allege that both PSRB and OSH were negligent in precisely the same ways and make no distinction between those two entities. In our view, there is a distinct difference between an allegation that PSRB and OSH were negligent "in releasing" Montwheeler and an allegation that negligent acts undertaken by OSH prior to Montwheeler's release hearing were a substantial factor in PSRB's decision to release Montwheeler.

We now consider the allegation of negligent release in paragraph 16(g) and reach the same conclusion. Paragraph 16(g) alleges that PSRB and OSH, "combining and concurring," were negligent:

> "(g)   In releasing Montwheeler without properly training or supervising its employees as to the proper standards for evaluating the mental health of its residents, including specifically Montwheeler, when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general[.]"

Although the negligence allegation in paragraph 16(g) refers to conduct that occurred prior to the decision to release Montwheeler—failure to train and supervise employees—we understand it to allege that the decision to release Montwheeler was negligent. For the same reason

that the state is entitled to quasi-judicial immunity for the negligence alleged in paragraph 16(d), we believe quasi-judicial immunity bars plaintiff's negligence claim for the conduct described in paragraph 16(g): PSRB's decision to release Montwheeler was undertaken by PSRB in its quasi-judicial role, and OSH releasing Montwheeler from commitment at OSH was undertaken by OSH pursuant to PSRB's discharge order.

   2.   *Negligent treatment, testing, and assessment*

       We next address the allegedly negligent acts described in paragraph 16(a), (b), and (c), turning our attention first to (a) and (c), which allege that PSRB and OSH, "combining and concurring," were negligent:

   "(a)  In failing to have and implement a reasonable medication management program when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general;

   "* * * * *

   "(c)  In failing to test or reasonably perform psychological testing on Montwheeler when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a threat to Annita Harmon and society in general."

       On appeal, the state argues that PSRB was not authorized to "implement a reasonable medication management program" for Montwheeler or "test or reasonably perform psychological testing" on Montwheeler and, further, that "once PSRB determined that Montwheeler did not suffer from a mental disorder, OSH had no authority to do so either." Plaintiff responds, as we understand her argument, that the negligence allegations in paragraphs 16(a) and (c) "arise from [OSH's] negligent treatment and assessment of Montwheeler, before the Board's hearing and decision to discharge him from PSRB jurisdiction and release him."

       We conclude that the trial court erred when it concluded that the state had met its burden to establish, as a

matter of law, that it was entitled to quasi-judicial immunity with regard to the allegations of negligence contained in paragraphs 16(a) and (c).

With regard to whether the state is entitled to quasi-judicial immunity for OSH's conduct, in our view, the performance of psychological testing and treatment of mental illness through medication management by OSH are not "functionally comparable to judicial actions" and do not "involve decisions normally performed by judges in their judicial capacity." *Praggastis*, 305 Or at 427. Nor are they acts "primarily concerned with [an] official's role as a judicial or quasi-judicial officer." *Id.*

Although there are perhaps specific acts or omissions undertaken by OSH that could be encompassed within the allegations of negligence alleged in paragraph 16(a) and (c) of plaintiff's complaint for which the state would be entitled to rely on the doctrine of quasi-judicial immunity, the doctrine does not sweep so broadly that all negligent acts by OSH in the assessment and treatment of those committed to its care and under the jurisdiction of the PSRB are immunized, such that the state would be entitled to quasi-judicial immunity for all such negligent acts. Nor do subsequent acts by PSRB in its quasi-judicial role—*e.g.*, holding a hearing and making a release decision—cloak earlier negligent acts performed by OSH with quasi-judicial immunity, such that the state is entitled to quasi-judicial immunity for those earlier acts by OSH. *Mendive*, 102 Or App at 322 ("A judge has no authority to cloak the future decisions of others with his own immunity or to accomplish the same thing by signing a court order after the fact.").[12]

With regard to whether the state is entitled to quasi-judicial immunity for PSRB's conduct, to the extent that the state is correct that PSRB is not authorized to implement a medication management program or perform psychological testing—and we have no reason to believe that the state is incorrect—that argument may provide a basis for summary judgment (or other appropriate motion), but it was not the basis for the state's summary judgment motion in the trial

---

[12] We do not foreclose the possibility that some other form of immunity might be applicable.

court. In our view, for the same reasons that state is not entitled to quasi-judicial immunity for the allegedly negligent conduct undertaken by OSH in paragraphs 16(a) and (c) of plaintiff's complaint, it is not entitled to quasi-judicial immunity if that same conduct was, instead, undertaken by PSRB, outside of its quasi-judicial role.[13]

We reach a different conclusion with regard to the allegation of negligence contained in paragraph 16(b) of plaintiff's complaint. That allegation provided that PSRB and OSH, "combining and concurring," were negligent as follows:

> "(b) In failing to reasonably assess Montwheeler's mental health condition before releasing him on or about December 7, 2016, when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general[.]"

On appeal, the state argues that it was entitled to quasi-judicial immunity with regard to that allegation of negligence because "PSRB's discharge order amounts to its assessment of Montwheeler's mental health condition" and because OSH's conduct in assessing Montwheeler's mental health prior to the PSRB hearing "is part of the PSRB's judicial function." Further, the state posits that "OSH did not act on behalf of Montwheeler or on behalf of the state" when assessing Montwheeler but, instead, acted as an "adjunct" to the PSRB.

In our view, insofar as plaintiff's complaint asserts that PSRB was negligent in "failing to reasonably assess Montwheeler's mental health condition," the state was entitled to quasi-judicial immunity for that conduct. PSRB's release decision, as set forth in the order of discharge, reflects its assessment of Montwheeler's mental health, and that assessment was undertaken by PSRB in its quasi-judicial

---

[13] We do not foreclose the possibility that quasi-judicial immunity might be available for treatment decisions in some contexts. That is, quasi-judicial immunity may be available for treatment decisions made by quasi-judicial bodies when operating in a quasi-judicial capacity. But this record does not provide a sufficient basis to apply the doctrine of quasi-judicial immunity to the specifications of negligence found in paragraph 16(a) and (c) of plaintiff's complaint.

role. As described above, the state is entitled to quasi-judicial immunity with regard to that decision undertaken by PSRB.

But, in our view, the state was not entitled to quasi-judicial immunity regarding the allegation that OSH was negligent in "failing to reasonably assess Montwheeler's mental health condition." We understand the allegation of negligence contained in paragraph 16(b) to be directed at OSH's purportedly negligent assessment of Montwheeler's mental health condition, which occurred prior to the PSRB's hearing and decision to discharge Montwheeler from PSRB jurisdiction and release him.

As noted, OSH is a mental health hospital operated and managed by the Oregon Health Authority and is used by the state for the "care and treatment of persons with mental illness." ORS 426.010. Montwheeler was committed to OSH in 1997, and over the ensuing years, he was assessed and treated by OSH staff on an ongoing basis. Concerning the specification of negligence contained in paragraph 16(b) of plaintiff's complaint, to the extent that OSH's negligent assessment occurred in connection with PSRB's quasi-judicial role, OSH (and by extension the state) is, perhaps, subject to quasi-judicial immunity, but OSH is not entitled to quasi-judicial immunity for *all* acts constituting negligent assessment of an individual's mental health condition in its care by virtue of the person being under PSRB jurisdiction, and by extension, nor is the state.

3.  *Negligent failure to warn*

We next address paragraph 16(i) of the complaint, which alleged that PSRB and OSH were negligent:

> "(i)   In failing to warn Annita Harmon that Montwheeler was in her community and presented a foreseeable risk of harm to her while he was not subject to state assessment, reporting, monitoring, accountability or control when the defendants knew, or in the exercise of reasonable care should have known that Montwheeler had a mental disorder as defined by law and that he posed a foreseeable threat of harm to Annita Harmon and society in general[.]"

As noted above, evidence adduced during summary judgment reflected that what notice people receive about the release of an individual from PSRB jurisdiction is an "administrative function" of PSRB, as opposed to a "deliberative" function. Consequently, we conclude that the trial court erred in concluding that the state had met its burden of proving that, as a matter of law, the doctrine of quasi-judicial immunity barred the negligence allegation set forth in paragraph 16(i). *See Praggastis*, 305 Or at 427 ("Judicial immunity is granted or withheld on the basis of the nature of the function being performed \* \* \*."); *see also Beason v. Harcleroad*, 105 Or App 376, 383, 805 P2d 700 (1991) (stating that in the context of 42 USC section 1983 claims, in determining whether absolute immunity applies, "a court must examine the function served by the conduct that gives rise to a claim for relief and determine whether it is investigative, administrative or quasi-judicial, *i.e.*, integral to the judicial process").

On appeal, the state argues that it is entitled to quasi-judicial immunity with regard to the failure to warn allegation in paragraph 16(i), because "the only way to attack the reasonableness of the state's failure to warn is to claim negligence or unreasonableness in the PSRB's determination that Montwheeler suffered from no mental disorder, and judicial immunity bars that kind of claim." The state's argument is premised on the state's view that, "[o]nce the PSRB determined that Montwheeler did not suffer from a mental disorder, the state had no reason to believe that Montwheeler was dangerous enough to require any warning."

The chief difficulty with the state's position is that Montwheeler was released after PSRB determined that the "the State did not sustain its burden of proving by a preponderance of the evidence that \* \* \* Montwheeler continues to be affected by a mental disease or defect," not because PSRB determined that Montwheeler no longer presented a substantial danger to others. Whether an individual is "affected by a mental disease or defect" is a different question from whether a person is dangerous. ORS 161.346. Whether or not the failure-to-warn negligence allegation is

ultimately tenable, in our view, the state failed to carry its burden to show it was entitled to quasi-judicial immunity as a matter of law in connection with the failure-to-warn negligence allegation in paragraph 16(i).

## V.   CONCLUSION

Release of an individual from PSRB jurisdiction requires that PSRB undertake a quasi-judicial process resulting in a quasi-judicial decision. The state is entitled to quasi-judicial immunity with regard to that decision by PSRB, and the state is entitled to quasi-judicial immunity when OSH complies with that decision. The state is also entitled to quasi-judicial immunity when PSRB, through PSRB's quasi-judicial process, assesses an individual's mental health.

However, the state is not entitled to quasi-judicial immunity for OSH's negligent treatment through medication, psychological testing, or assessment of an individual committed to its care, although quasi-judicial immunity may immunize the state for certain OSH conduct with regard to specific acts or omissions. Further, to the extent PSRB engaged in medication management or psychological testing outside its quasi-judicial role, the state likewise is not entitled to quasi-judicial immunity for those acts, which are not quasi-judicial in nature.[14]

Finally, given the record in this case, we conclude that the state is not entitled to quasi-judicial immunity for PSRB's and OSH's failure to warn Harmon of Montwheeler's release.

-----

[14] As previously noted, plaintiff argues PSRB was not authorized to "implement a reasonable medication management program" for Montwheeler or "test or reasonably perform psychological testing" on Montwheeler. As also previously noted, that was not a basis of the state's motion for summary judgment, but, if true, may be a basis for relief in the trial court.

We emphasize that our conclusion in this opinion does not reflect whether the doctrine of quasi-judicial immunity or some other form of immunity will ultimately bar recovery by plaintiff. It, instead, reflects only a conclusion that, given the record in this case, our standard of review, and the limited basis of the state's motion for summary judgment, the state did not meet its burden for dismissal of all of the allegations of negligence in plaintiff's complaint on the basis of quasi-judicial immunity.

Consequently, we conclude that the trial court erred, in part, when it granted the state's motion for summary judgment with respect to all of the specifications of negligence alleged in plaintiff's complaint.

Reversed in part and remanded; otherwise affirmed.